## TERLINDEN v. AMES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ILLINOIS.

No. 475.  Argued January 6, 7, 1902.—Decided February 24, 1902.

Extradition proceedings before a committing magistrate thereto duly authorized, where jurisdiction exists, and there is competent legal evidence tending to establish the criminality alleged, cannot be interfered with by *habeas corpus.*

In this case the writ of *habeas corpus* was issued before the examination by the commissioner was entered upon, and the inquiry was confined to the question of his jurisdiction.  He had jurisdiction if there was a treaty between this and the demanding country, and the commission of extraditable offences was charged.

Offences were charged to have been committed "contrary to the laws of Prussia," and although the violated laws were prescribed by imperial authority, they were nevertheless the laws of Prussia and were being administered as such by the Royal Prussian Circuit Court before which the charges were pending.

As the German Government has officially recognized, and continues to recognize, the treaty between the United States and the Kingdom of Prussia of June 16, 1852, as still in force, and not terminated because of impossibility of performance, and the Executive Department of this Government has accepted that view and proceeded accordingly, it is not for our courts to question the correctness of the conclusions of the German Government as to the effect of the adoption of the Constitution of the German Empire.

The question whether power remains in a foreign State to carry out its treaty obligations is in its nature political, and it is not within the province of the courts to interfere with the conclusions of the political department in that regard.

AUGUST 15, A. D. 1901, Dr. Walther Wever, Imperial German Consul at Chicago, filed his complaint before Mark A. Foote, Esq., a commissioner of the United States in and for the Northern District of Illinois, and specially authorized to issue warrants for the apprehension of fugitives from justice of foreign governments, stating that he was "the duly accredited official agent and representative of the German Empire at Chi-

cago and also the Kingdom of Prussia, forming a part of said German Empire," and charging that one Gerhard Terlinden, alias Theodor Graefe, a subject of the Kingdom of Prussia, did, within the first six months of the year 1901, " commit within the jurisdiction of the said Kingdom of Prussia various crimes of forgery and counterfeiting and the utterance of forged papers," in that as a director of the Gerhard Terlinden Stock Company, organized and doing business in said kingdom, said Terlinden forged and counterfeited certain certificates of the stock of said company amounting to about a million and a half of marks, and put out, uttered and disposed of the same to Robert Suermont of the city of Aachen, Prussia; the Amsterdamsche Bank, Netherlands; the Disconto Gesellschaft, a corporation doing business in Berlin, Prussia; and other persons and corporations, with felonious intent to cheat and defraud them respectively. The complaint further charged that Terlinden was at the time of committing said crimes a resident of the city of Duisburg and a citizen of said Kingdom of Prussia ; that he was a fugitive from said kingdom ; that on or about the first day of July, 1901, he fled into the jurisdiction of the United States of America for the purpose of seeking an asylum therein ; that he was now said to be concealed within the Northern District of Illinois or in the Eastern District of Wisconsin; and that the crimes with which he was charged were crimes embraced within the treaty of extradition between the United States and the Kingdom of Prussia, concluded on the 16th day of June, 1852, and ratified May 30, 1853.

It was therefore prayed that a warrant be issued for the apprehension and commitment of Terlinden " in order that the evidence of his criminality may be inquired into, and the said Gerhard Terlinden, alias Theodor Graefe, may be extradited and delivered up to the justice of the said Kingdom of Prussia, in accordance with the stipulations of said treaty and the acts of Congress passed in pursuance thereof."

The complaint was duly verified and the commissioner issued his warrant, which was placed in the hands of John C. Ames, United States marshal in and for the Northern District of Illinois, and Terlinden was apprehended and held to be dealt with according to law.

Subsequently and on September 25, 1901, Dr. Wever, in his capacity aforesaid made another complaint before the commissioner, charging (1) the forging of a large number of stock certificates of the Gerhard Terlinden Stock Company ; (2) uttering said stock certificates, well knowing them to be forged ; (3) forging and counterfeiting the steel stamp of the Royal Prussian revenue office at Duisburg, Prussia ; (4) imprinting said forged steel stamp upon the forged certificates of stock so as to make it appear that the tax required by the Prussian revenue law had been paid on said certificates issued by the company in said kingdom, and thus to give said forged certificates the appearance of genuineness ; (5) uttering forged certificates of stock with said forged stamp thereon ; (6) forging the acceptance of one Heinrich Schulte to a certain draft for nine thousand five hundred and eighty-two marks and thirty-five pfennings, and uttering the same ; (7) forging the acceptance of one Wilhelm Seven to two certain drafts for the sums of twenty-six thousand two hundred and fifty marks and of twenty-five thousand nine hundred and twelve marks and forty-five pfennings, respectively, and uttering the same ; or causing all these things to be done ; " contrary to the laws of the Kingdom of Prussia."

It was stated that these several crimes were fully shown by the testimony of a number of witnesses heard before the examining judge of the Landgericht at Duisburg in the Kingdom of Prussia, " a court of competent jurisdiction in which the matter of the penal investigation instituted against the said Gerhard Terlinden, alias Theodor Graefe, is now pending, in order that he may answer for said several crimes ; " and with the complaint were submitted copies of the depositions of the witnesses, together with a copy of the warrant of arrest issued by that court against Terlinden, " and of the provisions of the penal code of the German Empire applicable to said several crimes and providing punishment therefor," all of which were duly authenticated ; and also a verified English translation thereof. This second complaint also showed that the crimes charged were committed within the jurisdiction of the Kingdom of Prussia ; and that Terlinden was at the time of committing the same, a subject of that kingdom ; and the commissioner in

accordance with the prayer of the complaint issued another warrant, which was served on Terlinden the following day, he being discharged from arrest on the first warrant. On the 17th of October, before any evidence was taken before the commissioner, Terlinden presented to the District Court of the United States for the Northern District of Illinois his petition praying for a writ of *habeas corpus* on the following grounds:

" 1. No treaty or convention for the extradition of fugitives from justice exists between the United States and the German Empire.

" 2. That the treaty or convention for the extradition of fugitives from justice concluded between the United States and the Kingdom of Prussia on the 16th day of June, 1852, and ratified May 30, A. D. 1853, was terminated by the creation of the German Empire and the adoption of the Constitution of said Empire in A. D. 1871, and that no treaty or convention for the extradition of fugatives from justice has been concluded between the United States, on the one part, and the Kingdom of Prussia or the German Empire, on the other, since said time.

" 3. Said complaint does not charge an extraditable offence under the provisions of the treaty of 1852, concluded between the United States and Prussia and other German States, were said treaty still in force and of binding effect.

" 4. Your petitioner is not guilty of any extraditable offence under the provisions of said treaty of 1852, were said treaty still in force and of binding effect.

" 5. All proceedings had or attempted to be had before said commissioner under said complaint and warrant are illegal, void and without authority in law because said commissioner did not have jurisdiction over the person of this petitioner."

The writ of *habeas corpus* was issued and the marshal for the Northern District of Illinois filed his return October 21, setting forth that he " arrested said petitioner within said district on the 26th day of September, 1901, upon a warrant duly issued by Mark A. Foote, a United States commissioner specially appointed and authorized by the District Court of the United States for the Northern District of Illinois to hear applications for extradition and to issue warrants therefor, which

said warrant was duly issued by said commissioner upon a complaint duly made by Walther Wever, Imperial German Consul at Chicago as representative of the Kingdom of Prussia, charging said Gerhard Terlinden, who, it appears, falsely assumed in this country the name of Theodor Graefe, with having, as a subject of the Kingdom of Prussia and within the jurisdiction of the said kingdom, committed the crimes of forgery, counterfeiting and the utterance of forged instruments, and with being a fugitive from justice of said Kingdom of Prussia. . . ."

The matter was brought on for hearing October 21, and after arguments of counsel the court gave leave to present briefs and adjourned the hearing to October 28. On that day the relator filed with the clerk of the court a traverse, reciting that with the complaint of September 26 there were filed " copies of the original testimony and translations of the same contained in the depositions taken before certain court officials in the Empire of Germany, relative to the alleged offences with which said ' complaint charges your petitioner; that said complaint refers to said depositions so filed in words following, to wit: " [Then setting forth the passages of the complaint to the effect that Dr. Wever therewith submitted " to the commissioner and files with this complaint a copy of all depositions of witnesses taken in said matter, together with a copy of the warrant of arrest issued by said court against the said Gerhard Terlinden, alias Theodor Graefe, and of the provisions of the penal code of the German Empire applicable to said several crimes and providing punishment therefor."]

The traverse then continued:

" That the provisions of the Criminal Code of the German Empire applicable to the facts and circumstances of this case as shown by the evidence hereto annexed are sections 240, 47, 49 first paragraph; section 360 fourth and fifth paragraphs; section 275 and section 56 of the Code of Criminal Procedure, also section 234 of the Civil Code, a correct translation of which sections are hereto annexed and marked Exhibit ' B ' and made a part hereof.

" That said depositions so filed do not show or tend to show that your petitioner is guilty of any extraditable offence; that

a copy of said deposition so referred to in said complaint and heretofore filed with said commissioner is hereto attached marked Exhibit 'A' and made a part of this traverse.

"Wherefore your petitioner prays that the return of the United States marshal herein be dismissed and your petitioner discharged."

Copies of depositions were attached to the alleged traverse; but no copy of the warrant of arrest issued by the court at Duisburg, or of the provisions of the penal code attached to the complaint.

An affidavit accompanied the traverse to the effect that affiant as an expert had made the annexed translations of certain sections and parts of sections of the German criminal and civil codes.

October 29, to which day the hearing of the cause had been continued, Terlinden presented a petition for a writ of certiorari to bring before the court " for its consideration the depositions, provisions of the German Criminal Code and copy of the original warrant issued by said German court heretofore referred to."

This application was denied by the District Court, October 31, and the court ordered " that the question of whether since the formation of the German Empire the extradition treaty concluded between the Government of the United States and the Kingdom of Prussia in 1852 is still in force or abrogated by the Constitution of the German Empire, be submitted to the court on briefs to be filed," and continued the hearing. It was also ordered " that said relator be remanded to the custody of the marshal, and that the motion to stay all further proceedings before the United States commissioner be and the same hereby is denied."

Thereafter, on November 5, the District Court entered an order finding that the petitioner was lawfully restrained of his liberty, directing the petition to be dismissed, and remanding petitioner, from which an appeal was taken to this court. Errors were assigned, in substance, that the court erred in declining to hold that no treaty exists between the United States and the Kingdom of Prussia or the German Empire; in assum-

ing the existence of such treaty; in denying the right to introduce evidence for the purpose of showing that no extraditable offence had been committed; in denying the application for a certiorari; in holding that the record showed the commission of an extraditable offence.

*Mr. Albert W. May* and *Mr. A. C. Umbreit* for appellant. *Mr. Joseph B. Doe* was on their brief.

*Mr. William Vocke* for appellee. *Mr. William Mannhardt* was on his brief.

Mr. Chief Justice Fuller, after making the above statement, delivered the opinion of the court.

The treaty of June 16, 1852, between the United States and the Kingdom of. Prussia, and other States of the Germanic Confederation included in or which might accede to that convention, provided that the parties thereto should upon requisition " deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or assault with intent to commit murder, or arson, or robbery, or forgery, or the utterance of forged papers, or the fabrication or circulation of counterfeit money, whether coin or paper money, or the embezzlement of public moneys, committed within the jurisdiction of either party, shall seek an asylum, or shall be found within the territories of the other." 10 Stat. 964, 966.

Pursuant to § 5270 [1] of the Revised Statutes, (and the acts

---

[1] Sec. 5270. Whenever there is a treaty or convention for extradition between the Government of the United States and any foreign government, any justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, district, or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard

from which that section was brought forward,) complaint was duly made before a commissioner appointed and authorized by the District Court of the United States for the Northern District of Illinois to hear applications for extradition and to issue warrants therefor, charging Terlinden with having as a subject of the Kingdom of Prussia, and within the jurisdiction of that Kingdom, committed the crimes of forgery, counterfeiting and the utterance of forged instruments, and with being a fugitive from the justice of said kingdom.

The complaint charged with much particularity, among other things, the forging and uttering of forged stock certificates of the Gerhard Terlinden Stock Company; the forging of the revenue stamp of the German Government employed by the Royal Prussian Revenue Office; and the forging and uttering of several enumerated acceptances.

Attached to the complaint and referred to therein were duly authenticated[1] copies of certain depositions taken before the examining judge of the court at Duisburg, Prussia, in which an investigation against Terlinden, that he might answer for said several crimes, was pending, together with a copy of the war-

---

and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

[1] SEC. 5271. In every case of complaint and of a hearing upon the return of the warrant of arrest, any depositions, warrants, or other papers offered in evidence, shall be admitted and received for the purpose of such hearing if they shall be properly and legally authenticated so as to entitle them to be received as evidence of the criminality of the person so apprehended, by the tribunals of the foreign country from which the accused party shall have escaped, and copies of any such depositions, warrants or other papers, shall, if authenticated according to the law of such foreign country, be in like manner received as evidence; and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that any such deposition, warrant or other paper, or copy thereof, is authenticated in the manner required by this section.

rant for the arrest of Terlinden issued by that court, and of the provisions of the penal code of the German Empire applicable to the crimes in question and providing punishment therefor.

The commissioner issued his warrant and Terlinden was apprehended, whereupon and before the commissioner had entered upon the hearing, Terlinden petitioned and obtained from the District Court the writ of *habeas corpus* under consideration.

The settled rule is that the writ of *habeas corpus* cannot perform the office of a writ of error, and that, in extradition proceedings, if the committing magistrate has jurisdiction of the subject matter and of the accused, and the offence charged is within the terms of the treaty of extradition, and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on *habeas corpus*. *Ornelas* v. *Ruiz*, 161 U. S. 502, 508, and cases cited ; *Bryant* v. *United States*, 167 U. S. 104.

The statute in respect of extradition gives no right of review to be exercised by any court or judicial officer, and what cannot be done directly cannot be done indirectly through the writ of *habeas corpus*. The court issuing the writ may, however, " inquire and adjudge whether the commissioner acquired jurisdiction of the matter, by conforming to the requirements of the treaty and the statute ; whether he exceeded his jurisdiction ; and whether he had any legal or competent evidence of facts before him, on which to exercise a judgment as to the criminality of the accused. But such court is not to inquire whether the legal evidence of facts before the commissioner was sufficient or insufficient to warrant his conclusion." Blatchford, J., *In re Stupp*, 12 Blatch. 501 ; *Ornelas* v. *Ruiz*, 161 U. S. 508.

By section 754 of the Revised Statutes it is provided that the complaint in *habeas corpus* shall set forth " the facts concerning the detention of the party restrained, in whose custody he is detained, and by virtue of what claim or authority, if known ; " and by section 755 that the writ shall be awarded " unless it appea. from the petition itself that the party is not entitled thereto."

On the face of the complaint extraditable offences were charged to have been committed, and if petitioner desired to assert, as he now does in argument, that it appeared from the depositions taken before and the warrant of arrest issued by the court at Duisburg and the provisions of the criminal code that such was not the fact, they should have been set out. *Craemer* v. *Washington*, 168 U. S. 124, 128.

And this clearly must be so where, as in this case, the writ is issued and petitioner undertakes to traverse the return. The return was that Terlinden was arrested and held by virtue of warrants of arrest and of commitment issued by the commissioner, under the extradition acts, against Terlinden as a fugitive from the justice of Prussia, and charged with the commission of crimes embraced by the treaty of extradition with that kingdom; and copies of the warrants were attached as part thereof. The alleged traverse referred to the complaint and annexed copies of the depositions filed with it, but did not annex a copy of the warrant of arrest issued by the court at Duisburg, or of the provisions of the penal code made part of the complaint; and also annexed certain sections and paragraphs of the Criminal Code of the German Empire, and of the Code of Criminal Procedure, and of the Civil Code, as applicable to "the facts and circumstances of the case," and then alleged that the depositions did not show or tend to show guilt of an extraditable offence.

This was manifestly insufficient. Petitioner could not select a portion of the documents accompanying the complaint and ask the court to sustain his conclusion of law thereon. Nor could he subsequently supply the inadequacy of the traverse by a certiorari, which could do no more, if it could be, in any view, properly issued at that stage of the proceedings, than bring up what he should have furnished in the first instance.

Generally speaking, " whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of evidence, and is final for the purposes of the

preliminary examination unless palpably erroneous in law." *Ornelas* v. *Ruiz*, 161 U. S. 502, 509.

Necessarily this is so, for where jurisdiction depends on the merits, the decision is not open to collateral attack involving a retrial, although if on the whole record the findings are contradicted, the inquiry as to lack of jurisdiction may be entertained.

In this case the writ of *habeas corpus* was issued before the examination by the commissioner had been entered upon, and his jurisdiction was the only question raised. If he had jurisdiction, the District Court could not interfere, and he had jurisdiction if there was a treaty and the commission of extraditable offences was charged.

But it is said that the offences complained of were not extraditable because their commission was averred to be "contrary to the laws of Prussia," whereas the criminal laws asserted to have been violated were those of the German Empire, and Prussia had no criminal laws dealing with such offences. Hence it is argued that the commissioner had no jurisdiction, because if an extradition treaty existed it was with Prussia, and not with the German Empire; and if any crime was committed, it was against the German Empire and not Prussia.

It is true that by Article 2 of the Constitution of the German Empire it was provided that: "Within this territory the Empire shall have the right of legislation according to the provisions of this constitution, and the laws of the Empire shall take precedence of those of each individual state."

And by Article 4: "The following matters shall be under the supervision of the Empire and its legislation: . . . 13. General legislation regarding the law of obligations, criminal law, commercial law, and the law of exchange; likewise judicial proceedings."

Counsel for petitioner states in his brief that on January 1, 1872, the German Imperial Code went into effect, embracing provisions as to the crime of forgery "contained in sections 267, 268, 146 and 149, the very sections quoted in the depositions filed with the amended complaint." Counsel for respondent agrees with this except that he includes sections or para-

graphs 147 and 270. All these are given below as furnished by counsel for respondent.[1] And see Drage's Criminal Code of

---

[1] 267. Whoever with unlawful intent forges or counterfeits a domestic or foreign public instrument or such a private instrument as may be of importance for the purpose of proving rights or legal relations, and makes use of the same for the purpose of deception, is punishable with imprisonment for forgery of instruments.

268. Forgery of an instrument made by any one with the intent of obtaining for himself or another a pecuniary gain, or to inflict injury upon another, is punishable as follows:

1. When the instrument is a private instrument, with imprisonment in the penitentiary up to five years, besides which a fine not exceeding three thousand marks may be imposed.

2. When the instrument is a public instrument, with imprisonment in the penitentiary for a term not exceeding ten years, besides which a fine of from one hundred and fifty to six thousand marks may be imposed.

In case of mitigating circumstances imprisonment in the common jail will take place, which, in the case of forgery of a private instrument, shall be not less than one week, and in the case of forgery of a public instrument, not less than three months.

In addition to the imprisonment, a fine not exceeding three thousand marks may be imposed.

146. Whoever counterfeits inland or foreign coin or paper money for the purpose of using such counterfeited money as genuine or otherwise to put it in circulation; or who, with like intent, gives to genuine money, by alteration made upon the same, the appearance of higher value, or gives to invalidated money the appearance of money still current, shall be punished with imprisonment in the penitentiary for not less than two years. Police surveillance is also admissible. In the case of mitigating circumstances imprisonment in the common jail may be provided.

147. The same penalty extends to all persons who circulate the money counterfeited or altered by them with the above mentioned intent, and also to such persons who obtain counterfeited or altered money and either utter the same or bring the same from abroad with the intent of circulating the same.

149. Certificates of indebtedness made payable to the holder, bank notes, stock certificates or preliminary certificates or receipts taking their place, as well as coupons and dividends or renewal certificates thereto belonging, which may be issued by the Empire, the North German Confederation, a state of the Confederation, or a foreign state, or by any other community, corporation, company or private person authorized to issue such papers, are deemed equivalent to paper money.

270. It is treated as equivalent to forgery of an instrument in case anybody makes use of any forged or altered document, knowing the same to be forged or altered, with intent to deceive.

the German Empire, 227, 266. The traverse set up that there were filed with the complaint "a copy of all depositions taken in said matter, together with a copy of the warrant of arrest issued by said court against the said Gerhard Terlinden, alias Theodor Graefe, and of the provisions of the Penal Code of the German Empire applicable to said several crimes, and providing punishment therefor." The traverse did not set forth the warrant of arrest or the provisions of the code referred to, and merely attached certain other provisions which it was averred were applicable. The presumptions were against petitioner, apart from which, accepting the admissions of counsel, extraditable offences were charged, if the laws quoted applied, as we think cannot be denied. We are unable to perceive that these laws were not the laws of Prussia, although prescribed by imperial authority, and the record discloses that they were being administered as such, in Prussia, by the Royal Prussian Circuit Court at Duisburg. The inquiry into the source of the laws of the demanding government is not material, and the objection is untenable.

It is obvious that the District Court could not remove the case from the commissioner by virtue of the writ of *habeas corpus*, and that the court rightly declined to hear evidence, to grant the certiorari, or to interfere with the progress of the case.

This brings us to the real question, namely, the denial of the existence of a treaty of extradition between the United States and the Kingdom of Prussia, or the German Empire. In these proceedings the application was made by the official representative of both the Empire and the Kingdom of Prussia, but was based on the extradition treaty of 1852. The contention is that, as the result of the formation of the German Empire, this treaty had been terminated by operation of law.

Treaties are of different kinds and terminable in different ways. The fifth article of this treaty provided, in substance, that it should continue in force until 1858, and thereafter until the end of a twelve months' notice by one of the parties of the intention to terminate it. No such notice has ever been given, and extradition has been frequently awarded under it during the entire intervening time.

Undoubtedly treaties may be terminated by the absorption of Powers into other Nationalities and the loss of separate existence, as in the case of Hanover and Nassau, which became by conquest incorporated into the Kingdom of Prussia in 1866. Cessation of independent existence rendered the execution of treaties impossible. But where sovereignty in that respect is not extinguished, and the power to execute remains unimpaired, outstanding treaties cannot be regarded as avoided because of impossibility of performance.

This treaty was entered into by His Majesty the King of Prussia in his own name and in the names of eighteen other States of the Germanic Confederation, including the Kingdom of Saxony and the free city of Frankfort, and was acceded to by six other States, including the Kingdom of Würtemburg, and the free Hanseatic city of Bremen, but not including the Hanseatic free cities of Hamburg and Lubeck. The war between Prussia and Austria in 1866 resulted in the extinction of the Germanic Confederation and the absorption of Hanover, Hesse Cassel, Nassau and the free city of Frankfort, by Prussia.

The North German Union was then created under the praesidium of the Crown of Prussia, and our minister to Berlin, George Bancroft, thereupon recognized officially not only the Prussian Parliament, but also the Parliament of the North German United States, and the collective German Customs and Commerce Union, upon the ground that by the paramount constitution of the North German United States, the King of Prussia, to whom he was accredited, was at the head of those several organizations or institutions; and his action was entirely approved by this Government. Messages and Documents, Dep. of State, 1867–8, Part I, p. 601; Dip. Correspondence, Secretary Seward to Mr. Bancroft, Dec. 9, 1867.

February 22, 1868, a treaty relative to naturalization was concluded between the United States and His Majesty, the King of Prussia, on behalf of the North German Confederation, the third article of which read as follows: "The convention for the mutual delivery of criminals, fugitives from justice, in certain cases, concluded between the United States on the one part and Prussia and other States of Germany on the other

part, the sixteenth day of June, one thousand eight hundred and fifty-two, is hereby extended to all the States of the North German Confederation." 15 Stat. 615. This recognized the treaty as still in force, and brought the Republics of Lubeck and Hamburg within its scope. Treaties were also made in that year between the United States and the Kingdoms of Bavaria and Würtemburg, concerning naturalization, which contained the provision that the previous conventions between them and the United States in respect of fugitives from justice should remain in force without change.

Then came the adoption of the Constitution of the German Empire. It found the King of Prussia, the chief executive of the North German Union, endowed with power to carry into effect its international obligations, and those of his kingdom, and it perpetuated and confirmed that situation. The official promulgation of that Constitution recited that it was adopted instead of the Constitution of the North German Union, and its preamble declared that " His Majesty the King of Prussia, in the name of the North German Union, His Majesty the King of Bavaria, His Majesty the King of Würtemburg, His Highness the Grand Duke of Baden, and His Royal Highness the Grand Duke of Hesse and by Rhine for those parts of the Grand Duchy of Hesse which are situated south of the Main, conclude an eternal alliance for the protection of the territory of the Confederation, and of the laws of the same, as well as for the promotion of the welfare of the German people." As we have heretofore seen, the laws of the Empire were to take precedence of those of the individual States, and it was vested with the power of general legislation in respect of crimes.

Article 11 read " The King of Prussia shall be the president of the Confederation, and shall have the title of German Emperor. The Emperor shall represent the Empire among nations, declare war, and conclude peace in the name of the same; enter into alliances and other conventions with foreign countries, accredit ambassadors, and receive them. . . . So far as treaties with foreign countries refer to matters which, according to Article IV, are to be regulated by the legislature of the Empire, the consent of the Federal Council shall be required

for their ratification, and the approval of the Diet shall be necessary to render them valid."

It is contended that the words in the preamble translated " an eternal alliance " should read " an eternal union," but this is not material, for admitting that the Constitution created a composite State instead of a system of confederated States, and even that it was called a confederated Empire rather to save the *amour propre* of some of its component parts than otherwise, it does not necessarily follow that the Kingdom of Prussia lost its identity as such, or that treaties theretofore entered into by it could not be performed either in the name of its King or that of the Emperor. We do not find in this constitution any provision which in itself operated to abrogate existing treaties or to affect the status of the Kingdom of Prussia in that regard. Nor is there anything in the record to indicate that outstanding treaty obligations have been disregarded since its adoption. So far from that being so, those obligations have been faithfully observed.

And without considering whether extinguished treaties can be renewed by tacit consent under our Constitution, we think that on the question whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance. During the period from 1871 to the present day, extradition from this country to Germany, and from Germany to this country, has been frequently granted under the treaty, which has thus been repeatedly recognized by both governments as in force. Moore's Report on Extradition with Returns of all Cases, 1890.

In 1889, in response to a request for information on international extradition as practiced by the German Government, the Imperial Foreign Office transmitted to our chargé at Berlin a memorial on the subject, in the note accompanying which it was said : " The questions referred to, in so far as they could not be uniformly answered for all the confederated German States, have been answered in that document as relating to the case of applications for extradition addressed to the Empire or Prussia." It was stated in the memorial, among other things:

" In so far as by laws and treaties of the Empire relating to

the extradition of criminals, provisions which bind all the States of the union have not been made, those States are not hindered from independently regulating extradition by agreements with foreign States, or by laws enacted for their own territory.

" Of conventions, some of an earlier, some of a later period, for the extradition of criminals, entered into by individual States of the union with various foreign States, there exist a number, and in particular such with France, the Netherlands, Austria-Hungary, and Russia. With the United States of America, also, extradition is regulated by various treaties, as, besides the treaty of June 16, 1852, which applies to all of the States of the former North German Union, and also to Hesse, south of the Main, and to Würtemburg, there exist separate treaties with Bavaria and Baden, of September 12, 1853, and January 30, 1857, respectively." Moore's Report, 93, 94.

Thus it appears that the German Government has officially recognized, and continues to recognize, the treaty of June 16, 1852, as still in force, as well as similar treaties with other members of the Empire, so far as the latter has not taken specific action to the contrary or in lieu thereof. And see Laband, Das Staatsrecht des Deutschen Reichs, (1894), 122, 123, 124, 142.

It is out of the question that a citizen of one of the German states, charged with being a fugitive from its justice, should be permitted to call on the courts of this country to adjudicate the correctness of the conclusions of the Empire as to its powers and the powers of its members, and especially as the Executive Department of our Government has accepted these conclusions and proceeded accordingly.

The same is true as respects many other treaties of serious moment, with Prussia, and with particular States of the Empire, and it would be singular, indeed, if after the lapse of years of performance of their stipulations, these treaties must be held to have terminated because of the inability to perform during all that time of one of the parties.

In the notes accompanying the State Department's compilation of Treaties and Conventions between the United States and other Powers, published in 1889, Mr. J. C. Bancroft Davis treats of the subject thus:

" The establishment of the German Empire in 1871, and the complex relations of its component parts to each other and to the Empire, necessarily give rise to questions as to the treaties entered into with the North German Confederation and with many of the States composing the Empire. It cannot be said that any fixed rules have been established.

" Where a State has lost its separate existence, as in the case of Hanover and Nassau, no questions can arise.

" Where no new treaty has been negotiated with the Empire, the treaties with the various States which have preserved a separate existence have been resorted to.

" The question of the existence of the extradition treaty with Bavaria was presented to the United States District Court, on the application of a person accused of forgery committed in Bavaria, to be discharged on *habeas corpus*, who was in custody after the issue of a mandate, at the request of the minister of Germany. The court held that the treaty was admitted by both governments to be in existence.

" Such a question is, after all, purely a political one."

The case there referred to is that of *In re Thomas*, 12 Blatch. 370, in which the continuance of the extradition treaty with Bavaria was called in question, and Mr. Justice Blatchford, then District Judge, said :

" It is further contended, on the part of Thomas, that the convention with Bavaria was abrogated by the absorption of Bavaria into the German Empire. An examination of the provisions of the Constitution of the German Empire does not disclose anything which indicates that then existing treaties between the several States composing the confederation called the German Empire, and foreign countries, were annulled, or to be considered as abrogated.

" Indeed, it is difficult to see how such a treaty as that between Bavaria and the United States can be abrogated by the action of Bavaria alone, without the consent of the United States. Where a treaty is violated by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party, who may waive

or remit the infraction committed, or may demand a just satis-faction, the treaty remaining obligatory if he chooses not to come to a rupture. 1 Kent's Com. 174. In the present case the mandate issued by the Government of the United States shows that the convention in question is regarded as in force both by the United States and by the German Empire, represented by its envoys, and by Bavaria, represented by the same envoy. The application of the foreign government was made through the proper diplomatic representative of the German Empire and of Bavaria, and the complaint before the commissioner was made by the proper consular authority representing the German Empire and also representing Bavaria."

We concur in the view that the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard.

Treaties of extradition are executory in their character, and fall within the rule laid down by Chief Justice Marshall in *Foster* v. *Neilson*, 2 Pet. 253, 314, thus: "Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department."

In *Doe* v. *Braden*, 16 How. 635. 656, where it was contended that so much of the treaty of February 22, 1819, ceding Florida to the United States, as annulled a certain land grant, was void for want of power in the King of Spain to ratify such a provision, it was held that whether or not the King of Spain had power, according to the Constitution of Spain, to annul the grant, was a political and not a judicial question, and was decided when the treaty was made and ratified.

Mr. Chief Justice Taney said: "The treaty is therefore a law made by the proper authority, and the courts of justice have no right to annul or disregard any of its provisions, un-

less they violate the Constitution of the United States. It is their duty to interpret it and administer it according to its terms. And it would be impossible for the executive department of the Government to conduct our foreign relations with any advantage to the country, and fulfil the duties which the Constitution has imposed upon it, if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its constitution and laws, to make the engagements into which he entered."

Extradition may be sufficiently defined to be the surrender by one nation to another of an individual accused or convicted of an offence outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender.

In the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision. 1 Moore on Extradition, 21; *United States* v. *Rauscher*, 119 U, S. 407.

The power to surrender is clearly included within the treaty-making power and the corresponding power of appointing and receiving ambassadors and other public ministers. *Holmes* v. *Jennison*, 14 Pet. 540, 569. Its exercise pertains to public policy and governmental administration, is devolved on the Executive authority, and the warrant of surrender is issued by the Secretary of State as the representative of the President in foreign affairs.

If it be assumed in the case before us, and the papers presented on the motion for a stay advise us that such is the fact, that the commissioner, on hearing, deemed the evidence sufficient to sustain the charges, and certified his findings and the testimony to the Secretary of State, and a warrant for the surrender of Terlinden on the proper requisition was duly issued, it cannot be successfully contended that the courts could properly intervene on the ground that the treaty under which both governments had proceeded, had terminated by reason of the adoption of the constitution of the German Empire, not-

withstanding the judgment of both governments to the contrary.

The decisions of the Executive Department in matters of extradition, within its own sphere, and in accordance with the Constitution, are not open to judicial revision, and it results that where proceedings for extradition, regularly and constitutionally taken under the acts of Congress, are pending, they cannot be put an end to by writs of *habeas corpus*.

The District Court was right, and its final order is

*Affirmed.*

MR. JUSTICE HARLAN did not hear the argument and took no part in the decision of the case