**Tommaso ARGENTO, Relator,**

v.

**Xavier NORTH, U. S. Marshal,
Respondent.**

**Civ. A. No. 31713.**

United States District Court
N. D. Ohio, E. D.

May 26, 1955.

A. R. Fiorette and Creighton E. Miller, Cleveland, Ohio, for relator, Tommaso Argento.

Sumner Canary, U. S. Dist. Atty., Cleveland, Ohio, for respondent Xavier North.

Bulkley, Bulter & Rini, Cleveland, Ohio, submitted briefs on behalf of the Italian Consul.

CONNELL, District Judge.

Relator, an Italian national, has herein applied for a writ of habeas corpus, on the ground that his requested extradition to Italy is illegal, in that no valid treaty now exists between the United States of America and Italy, which would authorize such extradition.

He further claims that the treaty entered into in 1868 between such countries on such subject was abrogated by war as of December 11, 1941.

The Republic of Italy, which has herein requested the extradition of relator on a charge of murder, claims that such treaty is still in effect. No other question is before this court.

Respondent's Exhibit A offered in evidence herein consists of a certificate of the Secretary of State of these United States to the effect that, in accordance with our Treaty of Peace with Italy signed at Paris on February 10, 1947, 61 Stat. 1245,

"1. Each Allied or Associated Power will notify Italy, within a period of six months from the coming into force of the present Treaty, which of its pre-war bilateral treaties with Italy it desires to keep in force or revive. Any provisions not in comformity with the present

Treaty shall, however, be deleted from the above-mentioned treaties.

"2. All such treaties so notified shall be registered with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations.

"3. All such treaties not so notified shall be regarded as abrogated."

Such certificate further relates that as of February 6, 1948, the United States Government notified Italy that we desired to keep in force or revive certain pre-war bilateral treaties and other international agreements with Italy. It specifically enumerated those on Arbitration, Aviation, Conciliation, Consuls, Debt-Funding, Extradition, Narcotic Drugs, Navigation, Passport Visa Fees, Postal, Taxation and Trade-Marks. It specifically enumerated past Extradition agreements desired to be kept in force or revived, as follows:

*"Extradition*

"8. Extradition convention. Signed at Washington March 23, 1868. Ratified by the United States June 22, 1868. Ratified by Italy July 19, 1868. Ratifications exchanged September 17, 1868. Effective September 17, 1868 [15 Stat. 629].

"9. Additional article to extradition convention of 1868. Signed at Washington January 21, 1869. Ratifications exchanged at Washington May 7, 1869. Effective May 7, 1869 [16 Stat. 767].

"10. Supplementary convention to extradition convention of 1868. Signed at Washington June 11, 1884. Ratified by the United States April 10, 1885. Ratified by Italy August 8, 1884. Ratifications exchanged at Washington April 24, 1885. Effective April 24, 1885 [24 Stat. 1001]."

It is the contention of relator that such notification to Italy of our Government's desire to keep in force or revive such treaties was null and void and of no effect because it emanated from the State

Department of the U. S. Government. Relator contends that such action of our State Department constituted the usurpation of a power belonging to the U. S. Senate alone. Relator contends that war dissolved and abrogated the former treaty and that the only legal way in which extradition could now be had would necessarily be either through its revival by approval of the U. S. Senate or the negotiation of another treaty. Relator says that for lack of same he is entitled to be released. He contends that it was beyond the powers of the political department of our Government to determine which treaties could be kept in force or revived.

On the twelve subjects herein sought to be kept in force or revived by Article 44 of Section 9 of the bilateral treaty aforementioned, 61 Stat. 1386, there is no question but that in the ensuing eight years our respective governments have acted in accord therewith; there is no question but that during such time the U. S. Senate has not undertaken to question the power of the political branch of the government so to act; nor has either of the two respective governments involved ever since questioned the propriety, legality, efficacy or continuation thereof.

Eminent counsel for relator have here raised a most unique and ingenious question; it is not one of construction alone, but as to whether or not a treaty exists at all. Needless to say, for this court to hold that such treaty does not exist at all for the reasons claimed by relator, would be tantamount to judicially deciding that for the past eight years on the twelve highly important subjects set forth in such treaty, our government has constantly acted without authority of law, and that our U. S. Senate has meanwhile utterly failed in understanding, appreciating, or doing its plain duty. It would further be tantamount to judicially deciding that until future prospective treaties on such twelve highly important subjects can be again negotiated by the executive branch of our government and ratified by the U. S. Senate, or specifical-

ly revived by approval of the U. S. Senate, that all such international relationships now in force or process are null, void, and of no legal effect.

Relator's counsel suggests that the U. S. Senate conceivably might now quickly approve the past actions of the Executive Department in reviving the treaty. Such future suggested possibility in no wise lessens the responsibility herein expected to be assumed by the court should it undertake to judicially determine that for the past eight years our government through the alleged usurpation of power on the part of its executive branch and the alleged failure to perform its duty on the part of its legislative branch, had conducted its international relationships with another great government for many years on such highly important subjects, without authority so to do.

Counsel for both sides here cite the same cases as authority for their respective and opposite contentions. The cases cited indicate that wars now abrogate treaties only when and to the extent that their provisions are not compatible with war, but that war abrogates entirely those treaties of amity or friendship having a political character. There is little or nothing in the twelve phases of international relationships aforementioned between these two countries which could be said to be so incompatible with war as to justify a judicial determination that this treaty was abrogated: and it was most desirable that such relationships be immediately resumed and that the original status of the parties in these twelve respects be quickly re-established. Such resumption of such status did not require the specific approval of the U. S. Senate because the decision thus made to resume relationships was political in its nature and with propriety was so determined by the political department of our government. The U. S. Senate approved them all originally; war then made it physically impossible for their continuity but war had no intrinsic incompatibility towards the relationship itself. The only decision

herein made was that such relationship be resumed, revived and kept in force since the physical reason for its discontinuance had ended. We find no illegality in such action by the political department of our government in thus making the political determination that the time had come to resume such twelve relationships not intrinsically incompatible with hostilities. These twelve relationships involve the conduct of affairs for the mutual benefit of both countries and the protection of our citizens and their property rights in many respects, and the desirability of such speedy resumption was beyond any question. The fact that the political department was best equipped to make the decision as to the time for the resumption of the operation of these treaties originally approved by the U. S. Senate and in full operation for decades up to the interruption caused by war, can hardly be questioned by this court. And that the decision of the political department of the government is entitled to the court's every consideration was decided in a controlling case cited by both parties, namely that of Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 952, 57 L.Ed. 1274, to the following effect:

> "A construction of a treaty by the political department of the government, while not conclusive upon a court called upon to construe such a treaty in a matter involving personal rights, is * * * of much weight."

That was a matter of an extradition requested by Italy of us, though Italy had failed to similarly honor similar requests by us to them, and that relator claimed that such failure on Italy's part constituted abrogation of the treaty as the result of which he made the same contention now advanced by within relator. But the political department of our government nevertheless therein decided that the treaty was in force and effect and the Supreme Court considered its construction as of "great weight."

The question of the degree to which treaties are affected by war has often been before the Courts. The Chapter "Effect of War" found in 52 Am.Jur. page 813 and 87 C.J.S., Treason, § 14, p. 923, cites numerous instances of the raising of. similar questions. The general trend of decided cases is to leave decisions such as this to the political departments of government and the reason for the rule becomes the more cogent as wars seemingly increase in frequency and the later necessity for the expeditious resumption of past friendly relationships becomes more urgent.

The earliest reported case which set the pattern for this trend of decision was that of Society for Propagation of Gospel in Foreign Parts v. Town of New Haven, 8 Wheat. 464, 5 L.Ed. 662, decided March 12, 1823, to the following effect:

> "We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace * * *."

That case recently was cited in Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 1435, 91 L.Ed. 1633 to the following effect (June 9, 1947):

> "We start from the premise that the outbreak of war does not necessarily suspend or abrogate treaty provisions. * * * There may of course be such an incompatibility between a particular treaty provision and the maintenance of a state of war as to make clear that it should not be enforced. Karnuth v. United States, 279 U.S. 231, 49 S. Ct. 274, 73 L.Ed. 677."

Such opinion further states:

> "* * * It is argued, however, that the Treaty of 1923 with Germany must be held to have failed to survive the war, since Germany, as

a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community. But the question whether a state is in a position to perform its treaty obligations is essentially a political question. Terlinden v. Ames, 184 U.S. 270, 288, 22 S.Ct. 484, 491, 46 L.Ed. 534 [545]. We find no evidence that the political departments have considered the collapse and surrender of Germany as putting an end to such provisions of the treaty as survived the outbreak of the war or the obligation of either party in respect to them. The Allied Control Council has, indeed, assumed control of Germany's foreign affairs and Treaty obligations—a policy and course of conduct by the political departments wholly consistent with the maintenance and enforcement, rather than the repudiation, of pre-existing treaties."

That the question of extradition specifically came within the purview of such political as distinguished from judicial decisions was determined in Terlinden v. Ames, supra, as follows:

"3. The existence of the treaty of June 16, 1852, between the United States and Prussia, which has been repeatedly recognized by both governments as still in force, notwithstanding the incorporation of Prussia into the German Empire, cannot be questioned by the judicial department in proceedings for a writ of habeas corpus to prevent the extradition of a fugitive from Prussia who is held under extradition proceedings under that treaty, as the question is a political one, and the courts must accept the determination thereof by the political department of the government."

■ It is therefore the conclusion of this court that the action of the State Department of the U. S. Government as of February 6, 1948, in notifying the Italian Government that the Govern-

ment of the United States desired to keep in force and to revive the twelve Treaties in question including that of Extradition, all in conformity with Article 44 of the Treaty of Peace of February 10, 1947, was not only entitled to great weight but so much so as to constrain us to consider it determinative of the question before us. The writ of habeas corpus herein applied for should therefore be denied.