**Jesse Lopez TAVAREZ, Ex Parte,
Petitioner-Appellant,**

v.

**U. S. ATTORNEY GENERAL,
Respondent-Appellee.**

No. 81–1295
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 22, 1982.
Rehearing Denied March 22, 1982.

Joseph J. Rey, Jr., El Paso, Tex., for petitioner-appellant.

Shirley Baccus-Lobel, Asst. U.S. Atty., Dallas, Tex., for respondent-appellee.

Before CLARK, Chief Judge, REAVLEY and RANDALL, Circuit Judges.

REAVLEY, Circuit Judge:

. This case presents a novel question under the United States-Mexico treaty concerning the transfer of criminal prisoners and its implementing legislation, Act of Oct. 28, 1977, Pub.L. No. 95–144, 91 Stat. 1212 (codified at 18 U.S.C. §§ 3244, 4100–4115 (Supp. III 1979)) (hereinafter the "Foreign Offenders Transfer Act"): If a Mexican national, who has been convicted of a crime under state law in the United States and has been transferred to Mexico to serve his sentence, escapes from the custody of Mexican authorities and returns to this country, may the Attorney General apprehend him without a warrant and return him to Mexican authorities without extradition proceedings? We hold that he may and affirm the judgment of the district court.[1]

## I.

Jesse Lopez Tavarez, a Mexican national, was convicted of voluntary manslaughter and sentenced to eight years imprisonment by a Texas state court. He began serving his sentence in a Texas state prison in October 1977. Shortly thereafter, Congress passed the Foreign Offenders Transfer Act in order to implement treaties with Mexico and Canada providing for the transfer of offenders and allowing an offender to serve his sentence in his own nation. Pursuant to the United States-Mexico treaty of November 25, 1976, T.I.A.S. No. 8718 (the "Treaty") and the Act, Tavarez requested transfer to Mexico. In July 1978, the state of Texas delivered Tavarez into the custody of the United States Attorney General, who, in turn, handed him over to Mexican authorities.

In July 1979, Tavarez escaped from the Mexican prison in which he was serving his sentence. Sometime thereafter, he re-entered the state of Texas. On April 1, 1981, the Attorney General of Mexico wrote to the United States Attorney General requesting that Tavarez be returned to Mexico to complete his sentence. Tavarez was apprehended by the FBI, without a warrant,[2] on April 17, 1981. The Attorney General took the position that he could hold Tavarez without any hearing or appearance before a magistrate, and hand him over to Mexican authorities without extradition proceedings. Tavarez filed a petition for a writ of habeas corpus, which the district court denied.

---

1. We would not ordinarily proceed to decide an issue of this nature without oral argument. Neither party, however, has requested oral argument, and the government has averred that "the decisional process would not be significantly aided by oral argument." Fed.R.App.P. 34(a)(3). Since the facts are undisputed—they were stipulated to before the magistrate—and since neither party has made the slightest attempt to research the legal issues—not a single case is cited in either brief—we agree with the parties that oral argument would be a waste of this court's time and resources.

2. There is no question in this case that the FBI had probable cause to believe that Tavarez had escaped from prison and that the man it apprehended was Tavarez.

## II.

The government contends that Tavarez is in the same position as a convict who has escaped from a federal penitentiary. When Tavarez requested to be transferred to Mexico, Texas put him into the custody of the United States Attorney General. While the government transferred Tavarez to Mexico, at his request and with his consent, it argues that it never relinquished "constructive custody" of Tavarez. Tavarez was simply serving his American sentence in a Mexican prison; once Tavarez escaped from imprisonment, the government had as much right to take him back into custody as if he had escaped from a federal penitentiary.

Tavarez argues that, when the government surrendered him to Mexico, it relinquished its power to keep him in custody. Tavarez relies heavily on 18 U.S.C. § 4107(b)(2), under which the transferee must give his consent that "the sentence shall be carried out according to the laws of the country to which he is to be transferred." United States law no longer governs the "carry[ing] out" of his sentence; therefore, he argues, the government has no legal basis for resuming custody. The government can return him to Mexican authorities, he concludes, only if it commences extradition proceedings under 18 U.S.C. § 3184. This argument, if accepted, may preclude surrender of Tavarez to Mexican authorities, because it is doubtful that Tavarez has "committed [a crime] within the jurisdiction" of Mexico, as required by 18 U.S.C. § 3184. Tavarez committed voluntary manslaughter in the state of Texas; Tavarez' escape from prison, the government and Tavarez agree, was not a crime in Mexico.[3]

Neither § 4107(b)(2) nor any other provision of the statute has the effect that Tavarez urges. Section 4107(b) merely states the conditions to which a prisoner must consent prior to transfer. It does not attempt to define the power of the state or federal government over a prisoner after his transfer. But even if that section does confer enforceable rights on the transferred prisoner, Tavarez simply misinterprets the meaning of the provision that "the sentence shall be carried out according to the laws of" Mexico. This clause means that Mexican law will govern the conditions of confinement and the opportunity for early release through parole or good-time credits. See Treaty, art. V(2).[4] The very purpose of the Foreign Offenders Transfer Act was to give a prisoner the benefit of more favorable conditions of confinement—including opportunities for good-time credits and parole—that might be available in his own country. H.Rep.No.720, 95th Cong., 1st Sess. 1–2, reprinted in [1977] U.S.Code Cong. & Ad.News 3146, 3146–47 (concentrating on the deprivations—including lengthy sentences without parole—suffered by Americans imprisoned in Mexico for drug offenses). Thus, the statute provides that an offender transferred to the United States "shall remain in the custody of the Attorney General under the same conditions and for the same period of time as an offender who had been committed to the custody of the Attorney General by a court of the United States for the period of time imposed by the sentencing court." 18 U.S.C. § 4105(a). The transferred offender also has the same opportunity for good-time credits, see id. § 4105(c), and for parole, see id. § 4106. See generally id. § 4103.[5]

---

**3.** Escape is a crime in Mexico only if effected "with another or others" or with "violence against other persons." Mexican Federal Penal Code art. 154. Neither the United States nor the Mexican government has claimed that Tavarez' escape met either condition.

**4.** "[T]he completion of a transferred offender's sentence shall be carried out according to the laws and procedures of the Receiving State, including the application of any provisions for

reduction of the term of confinement by parole, conditional release or otherwise." Treaty, art. V(2).

**5.** "All laws of the United States, as appropriate, pertaining to prisoners, probationers, parolees, and juvenile offenders shall be applicable to offenders transferred to the United States, unless a treaty or this chapter provides otherwise." 18 U.S.C. § 4103.

The statute also makes clear that while the laws of the receiving nation shall govern the manner in which the sentence is served, the laws of the sentencing nation shall continue to govern both the validity of the conviction and the term of the sentence. Thus, one of the other conditions of transfer to which a prisoner must consent is that "only the appropriate courts in the United States may modify or set aside the conviction or sentence, and any proceedings seeking such action may only be brought in such courts." 18 U.S.C. § 4107(b)(1). This condition is enacted into positive law both by the Treaty, art. VI,[6] and by 18 U.S.C. § 3244(1).[7]

These provisions demonstrate that, under the scheme of the Treaty and the statute, the sentencing nation retains the paramount interest in seeing that the entire term of sentence is completed, albeit completed pursuant to the laws of the receiving nation. This interest is also protected by the condition of transfer under which the offender must understand that the sentencing nation retains the power to reacquire custody in at least one instance: the prisoner "may be returned to the United States for the purpose of completing his sentence" if the receiving nation determines that the transfer was invalid and the United States requests his return. *Id.* § 4107(b)(3). The statute does not attempt to establish or define the custodial authority of either the federal government or the state government when such an offender is returned. Instead, Congress apparently assumed that the respective governments already had the power to require completion of such sentences.

Similarly, the statute does not specifically address the question of the Attorney General's power to regain custody of a transferred offender who escapes from custody and re-enters this country. The statute does not, however, deprive the Attorney General of such power.

Since the statute itself does not settle the question presented, we must determine the scope of the authority the statute gives to the Attorney General in light of the general principles of law concerning the government's power to return escaped convicts to custody. We think that the inquiry involves two questions: First, does the Attorney General have the power to apprehend the offender without a warrant or a hearing? Second, may the Attorney General return the offender to Mexico without a hearing?

## III.

Generally, the legal custodian of an escaped convict can return the fugitive to custody without a warrant or a hearing. *See, e.g., Rush v. United States,* 290 F.2d 709 (5th Cir. 1961) (federal authorities may reacquire custody of escaped convict from state authorities and return him to federal penitentiary in another state without a removal warrant and without a hearing before a magistrate), *followed in Bandy v. United States,* 408 F.2d 518, 521 (8th Cir.), *cert. denied,* 396 U.S. 890, 90 S.Ct. 180, 24 L.Ed.2d 164 (1969); *United States v. Mensik,* 440 F.2d 1232, 1234 (4th Cir. 1971) (FBI need not serve warrant on prisoner in escape status); *United States v. Reed,* 413 F.2d 338, 340 (10th Cir. 1969) (recapture of escaped convicts not an arrest requiring appearance before magistrate), *cert. denied,* 397 U.S. 954, 90 S.Ct. 982, 25 L.Ed.2d 137 (1970).[8] The reason that the custodian need

---

**6.** "The Transferring State shall have exclusive jurisdiction over any proceedings, regardless of their form, intended to challenge, modify, or set aside sentences handed down by its courts. The Receiving State shall, upon being advised by the Transferring State of action affecting the sentence, take the appropriate action in accordance with such advice." Treaty, art. VI.

**7.** "[T]he country in which the offender was convicted shall have exclusive jurisdiction and competence over proceedings seeking to chal-

lenge, modify, or set aside convictions or sentences handed down by a court of such country." 18 U.S.C. § 3244(1).

**8.** *See* Holtzoff, *Removal of Defendants in Federal Criminal Procedure,* 4 F.R.D. 455, 458 (1945) ("[I]n [an escape] situation no judicial process appears necessary. The prisoner may be retaken and administratively returned to the custody from which he escaped."); *cf. United States v. Polito,* 583 F.2d 48, 54–56 (2d Cir. 1978) (because the status and rights of a parole

not normally resort to the judicial process is that the escaped convict "may be . . . confined under the authority of the original judgment until the term of his imprisonment has been accomplished." *United States ex rel. Nicholson v. Dillard*, 102 F.2d 94, 96 (4th Cir. 1939).[9]

Thus, the resolution of our first question turns on the scope of the Attorney General's authority as custodian of Tavarez. Under the statute,

The Attorney General is authorized—

    .     .     .     .     .

    (3) to transfer offenders under a sentence of imprisonment . . . to the foreign countries of which they are citizens or nationals;

    .     .     .     .     .

    (6) to make arrangements by agreement with the States for the transfer of offenders in their custody who are citizens or nationals of foreign countries to the foreign countries . . . [.]

18 U.S.C. § 4102. To effectuate his power to transfer Tavarez, and to hold a consent verification proceeding before a federal judicial officer, as required by 18 U.S.C. § 4107(a), the Attorney General made an agreement with the state of Texas in which the state surrendered custody of Tavarez to the Attorney General.

Inherent in the power to transfer an offender to a foreign country is the power to exercise custody over the offender for the purpose of effecting the transfer. Had Tavarez escaped from federal custody while awaiting the consent verification proceeding, or while *en route* through the United States to Mexico, we have no doubt that the Attorney General could recapture him for the purpose of completing the transfer. The question, therefore, is whether the Attorney General's authority to exercise custody for the purpose of effecting the transfer [10] is lost once the initial transfer is completed.

▇ We hold that the authority is not lost. A sovereign does not lose its power to keep a convict in custody by turning the convict over to another sovereign for service of a sentence. *Floyd v. Henderson*, 456 F.2d 1117 (5th Cir. 1972) (federal government did not waive its power to resume custody over convict for completion of federal sentence by transferring him to state prison for concurrent service of state and federal sentences); *Mitchell v. Boen*, 194 F.2d 405, 407 (10th Cir. 1952). "[T]he question of jurisdiction and custody is one of comity between the two governments and not a personal right of the prisoner." *Jones v. Taylor*, 327 F.2d 493, 493–94 (10th Cir.), *cert. denied*, 377 U.S. 1002, 84 S.Ct. 1937, 12 L.Ed.2d 1051 (1964), *cited with approval in Floyd v. Henderson*, 456 F.2d at 1119.

---

violator are analogous to those of an escaped convict, his detention is "not an 'arrest' for Fourth Amendment purposes"). *See also* 18 U.S.C. § 3050 (authorizing Bureau of Prisons employees to return escaped prisoner to custody after effecting warrantless arrest for violation of escape statutes).

**9.** The principle that an escaped convict is legally confined under the original judgment of conviction immediately upon recapture is also supported by the line of cases holding that the *McNabb* rule—which requires suppression of confessions if the prisoner is not promptly brought before a magistrate "in order to determine the sufficiency of the justification for [his] detention," *McNabb v. United States*, 318 U.S. 332, 344, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943) —does not apply when escaped convicts are apprehended. *E.g., Mullican v. United States*, 252 F.2d 398, 400 (5th Cir. 1958); *Redinger v. United States*, 404 F.2d 310, 312 (10th Cir.

1968) (the escapee's situation is "the same as though he had been returned to the original place of incarceration immediately after his arrest").

**10.** We have no occasion in this case to determine the Attorney General's power to confine the offender, or to return him to the state for confinement, in the event that the receiving nation does not request and does not desire the return of the offender for completion of sentence. We also note that this case does not involve a United States citizen; thus, we do not consider whether the command of 18 U.S.C. § 4001(a)—that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress" —might require a more explicit grant of statutory authority than that we find implicit in the Act.

Tavarez argues that the Attorney General's power to exercise custody applies only to the initial transfer. But there is no provision of the statute that requires this result. To the contrary, the only indication the statute gives is that the federal and state governments retain their power—within the limits imposed by principles of jurisdiction [11] and comity—to regain custody if the sentence is not completed.[12] *See* 18 U.S.C. § 4107(b)(3). We hold, therefore, that the Attorney General's statutory power to exercise custody for the purpose of transfer includes the power to apprehend an offender who escapes from the confinement to which he has been transferred.

### IV.

■ May the Attorney General return the offender to Mexico without a hearing?

■ Tavarez asserts that the government must commence extradition proceedings. The government's return of Tavarez to Mexico, however, is not an "extradition." "Extradition may be sufficiently defined to be the surrender by one nation to another of an individual accused or convicted of an offense *outside of its own territory, and within the territorial jurisdiction of the other,* which, being competent to try and to punish him, demands the surrender." *Terlinden v. Ames,* 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902) (emphasis added). The procedures of 18 U.S.C. § 3184, which contains a similar definition of extra-

dition, are simply inapplicable to this case.[13] The government is not surrendering Tavarez for a crime committed in Mexico; to the contrary, it is attempting to enforce its own laws concerning the proper place of confinement for crimes committed in this country.

While we hold the extradition process inapplicable, we do not therefore conclude that the apprehended individual is entitled to no procedural protection. Granting the government power to remove an individual from the street and surrender him to foreign confinement without judicial process creates a grave danger of erroneous deprivation of liberty. While the courts have held that no hearing is required prior to a return to imprisonment within this country, *see Rush v. United States, supra,* this rule does not fully control the present case.

When an escaped convict is returned to prison without a hearing, the requirements of due process apparently [14] are not offended for two reasons: first, the convict has already received all the process he is due concerning his conviction and sentence, *see United States ex rel. Nicholson v. Dillard,* 102 F.2d at 96; second, the danger of erroneous deprivation—for example, in a case of mistaken identity or a legitimate dispute concerning the fact of escape [15]—is alleviated by the availability of habeas corpus relief. While a prisoner returned to a foreign nation will always have enjoyed the benefit of the first safeguard, his banishment to a foreign prison may make it difficult for him

---

**11.** It is axiomatic that one sovereign cannot enforce its criminal laws within the territory of another sovereign.

**12.** Of course, the sentencing nation would not have the power to regain custody if the sentence, although incomplete under its own laws, has been completed under the laws of the receiving nation. *See* Treaty, art. V(2). Tavarez did claim in the district court that, under Mexican law, a sentence is complete when a prisoner successfully escapes. The district court, however, rejected this claim as frivolous since it was contrary to clear provisions of Mexican law and deemed "absurd" by the office of the Attorney General of Mexico. Tavarez has not raised the point on appeal.

**13.** The statute provides that extradition proceedings may be commenced when a person is "charg[ed] ... with having committed *within*

*the jurisdiction of [a] foreign government* any of the crimes provided for by [a] treaty or convention." 18 U.S.C. § 3184 (emphasis added). The procedures of § 3184 are designed to ensure that "the evidence [of such a crime is] sufficient to sustain the charge under the provisions of the proper treaty or convention." *Id.* The sufficiency of the evidence of Tavarez' crime has already been determined by an American court; there is no applicable "treaty or convention" against which the sufficiency of that evidence could be reexamined.

**14.** We have found no case that gives full-dress consideration to the issue.

**15.** We note that the present case involves neither situation.

to enjoy the benefit of the second. True, a federal habeas corpus court is always open to a person transferred under the Act to a foreign prison, *see* 18 U.S.C. §§ 3244(1), (2), (4), 28 U.S.C. § 2241(c)(1)–(3); but, given the uncertainty whether foreign officials would allow the prisoner prompt access to the United States federal courts,[16] we doubt that the post-surrender availability of habeas corpus is a sufficient safeguard against the possibility of erroneous deprivation.

█ We hold that a person who is apprehended as an escapee from a foreign prison after transfer pursuant to the Act must be given the opportunity—as Tavarez was here—to consult with a lawyer and to petition a federal habeas court for a stay of his return to the foreign nation pending the resolution of any issue concerning the legality of his return.[17] *See In re Wainwright*, 518 F.2d 173, 174 (5th Cir. 1975) (district court has "inherent power" to control custody of prisoner pending its decision on habeas petition); *Jimenez v. Aristiguieta*, 314 F.2d 649, 652 (5th Cir. 1963) (district court has "inherent power" to stay extradition of petitioner pending his appeal of court's denial of habeas corpus).

Tavarez argues that we should also require the government to again elicit his consent under 18 U.S.C. § 4107 before it returns him to Mexico. Such a requirement would be contrary to the statute. Tavarez is not now being "transferred" within the meaning of the Act. He was transferred in 1978; he is now being returned to the custody to which he consented at that time. He agreed at that time that his consent was irrevocable. 18 U.S.C. § 4107(b)(4); *see id.* § 4100(b) ("Once an offender's consent to transfer has been verified . . . , that consent shall be irrevocable."). If he were still in prison in Mexico, he would have no right to

return to confinement in the United States; he acquired no greater rights by virtue of his escape and re-entry into this country.

### V.

To summarize: Provided that he is given a reasonable opportunity to consult with counsel and to file a petition for a writ of habeas corpus, a person apprehended after escape from a foreign prison to which he has been transferred under the Foreign Offenders Transfer Act may be returned to the foreign nation without further judicial proceedings. Appellant Tavarez has been given the opportunity to have the legality of his confinement reviewed by the federal courts; he has presented no valid objection to his return to Mexico.

AFFIRMED.

---

**16.** *See Rosado v. Civiletti*, 621 F.2d 1179, 1186–87 (2d Cir.) (giving results of government's investigation into charges, *inter alia*, that Mexican officials often hold prisoners incommunicado for extended periods of time and deny access to counsel), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). *See generally* H.Rep.No.720, 95th Cong., 1st Sess. 1–2, *reprinted in* [1977] U.S.Code Cong. & Ad.News

3146, 3146–47 (canvassing complaints against Mexican prison officials).

**17.** The prisoner should not be granted a stay pending an attack on his original conviction, sentence, or transfer. Under the statute, the prisoner has consented to launch such an attack from his foreign cell. *See* 18 U.S.C. § 4107(b)(1); *id.* §§ 3244(2), (4).