UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT
 

No. 97-1084

UNITED STATES OF AMERICA,
Appellant,

v.

LUI KIN-HONG, a/k/a JERRY LUI,
Appellee.



BEFORE BEFORE

TORRUELLA, Chief Judge, TORRUELLA, Chief Judge, 
ALDRICH, Senior Circuit Judge, ALDRICH, Senior Circuit Judge, 
SELYA, BOUDIN, STAHL*, and LYNCH, Circuit Judges, SELYA, BOUDIN, STAHL*, and LYNCH, Circuit Judges, 

ORDER OF EN BANC COURT ORDER OF EN BANC COURT

Entered: April 17, 1997  Entered: 

The suggestion for the holding of a rehearing en banc having
been carefully considered by the judges of this Court in regular
active service and a majority of said judges not having voted to
order that the appeal be heard or reheard by the Court en banc,

It is ordered that the suggestion for rehearing en banc be
denied.

By the Court:


William H. Ng, Clerk

[cc: Messrs. Whiting, Good, Posner]

* Dissent follows.

STAHL, Circuit Judge, (dissenting). Because I do STAHL, Circuit Judge, (dissenting). 

not believe that the panel's opinion reaches the correct

result, and because I believe that this case raises numerous

difficult and complex questions of law that warrant the full

court's considered attention, I would grant the petition. I

therefore respectfully dissent from the court's decision to

deny rehearing en banc.

I. The Treaty Language  I. The Treaty Language 

The extradition request in this case was made by

authorities of the British Crown Colony of Hong Kong pursuant

to two bilateral treaties dating from 1972 -- a primary

agreement and a supplemental treaty -- that both the United

States and the United Kingdom have signed and ratified.1 The

main treaty applies to Hong Kong by an exchange of diplomatic

notes made in October 1976, see 28 U.S.T. at 238-41, while 

the supplemental treaty by its terms applies to the United

Kingdom and "the territories for whose international

relations the United Kingdom is responsible," which, as

 

1See Extradition Treaty Between the Government of 
the United States of America and the Government of the United
Kingdom of Great Britain and Northern Ireland, June 8, 1972,
28 U.S.T. 227 [hereinafter "the treaty"] and Supplemental 
Treaty Between the Government of the United States of America
and the Government of the United Kingdom of Great Britain and
Northern Ireland, June 25, 1985, T.I.A.S. No. 12050
[hereinafter "the supplemental treaty"].  

-2- 2

listed in an annex, includes Hong Kong.2 In 1984, the United

Kingdom and the People's Republic of China issued a Joint

Declaration, which was ratified and entered into force in

1985, under which sovereignty over Hong Kong will revert to

China on July 1, 1997.3 In 1985, the United States signed

the supplemental treaty and the United States Senate ratified

it the following year. Despite being ratified after the well-

publicized Sino-British Joint Declaration regarding Hong

Kong's future status, the supplemental treaty says nothing

about fugitives sought for extradition ("relators") to Hong

Kong, like Lui Kin-Hong, who can demonstrate that their trial

will occur after Hong Kong's reversion to China.

"In construing a treaty, as in construing a

statute, we first look to its terms to determine its

meaning." United States v. Alvarez-Machain, 504 U.S. 655, 

663 (1992) (citing Air France v. Saks, 470 U.S. 392, 397 

 

2The supplemental treaty specifically applies to
Great Britain and Northern Ireland, the Channel Islands, the
Isle of Man, Anguilla, Bermuda, the British Indian Ocean
Territory, the British Virgin Islands, the Cayman Islands,
the Falkland Islands, the Falkland Island Dependencies,
Gibraltar, Hong Kong, Montserrat, Pitcairn, Henderson, Ducie
and Oeno Islands, St. Helena, the St. Helena Dependencies,
the Sovereign Base Areas of Akrotiri and Dhekelia in the
Island of Cyprus, Turks and Caicos Islands. See Art. 6 & 
Annex.  

3See Joint Declaration of the Government of the 
United Kingdom of Great Britain and Northern Ireland and the
Government of the People's Republic of China on the Question
of Hong Kong, Dec. 19, 1984, 1984 Gr. Brit. T.S. No. 20 (Cmd.
9352) [hereinafter "the Joint Declaration"]. 

-3- 3

(1985); Valentine v. United States ex rel. Neidecker, 299 

U.S. 5, 11 (1936)). Article I of the primary US-UK bilateral

extradition treaty provides that "[e]ach Contracting Party

undertakes to extradite to the other" persons accused or

convicted of certain enumerated offenses "subject to the

conditions specified in this Treaty." Among the conditions

that the treaty specifies are those found in Article XII,

which incorporates a "specialty" provision, a common feature

of extradition treaties,4 and contains a prohibition against

a relator's re-extradition to stand trial in a third state.

Article XII in relevant part provides:

(1) A person extradited shall not be
detained or proceeded against in the
territory of the requesting Party for any
offense other than an extraditable
offense established by the facts in
respect of which his extradition has been
granted, or on account of any other
matters, nor be extradited by that Party
to a third State -- 
(a) until after he has returned to
the territory of the requested Party; or
(b) until the expiration of thirty
days after he has been free to return to
the territory of the requested Party.

 

4See Kenneth E. Levitt, Note, International 
Extradition, The Principle of Specialty, and Effective Treaty 
Enforcement, 76 Minn. L. Rev. 1017, 1022-24, 1027-28 (1992) 
("The principle of specialty allows requesting states to try
or punish defendants only for the offenses for which they
were extradited. . . . Most United States extradition
treaties currently in force, and all negotiated within the
last one hundred years, incorporate the principle of
specialty.").

-4- 4

Lui's case raises the difficult question of the

proper interpretation to be given to this Article of the

extradition treaty and the specialty provision incorporated

therein in the peculiar situation that the record reveals.

The evidence shows and the government concedes that Lui will

be tried in the court system of a sovereign other than that

of the requesting Party and different than the one he would

have been tried by but for the reversion of sovereignty over

Hong Kong to China. As the district court found in granting

habeas relief, the "uncontradicted evidence" establishes, as

the government now concedes, that "[t]he reality . . . is

that the Crown Colony of Hong Kong will not be able to try

and to punish Lui by the time of reversion." Lui Kin-Hong v. 

United States, Civ. A. No. 96-104849-JLT, -- F. Supp. --, 

1997 WL 37477, at *3 (D. Mass. January 7, 1997) (as corrected

January 9, 1997). 

The difficult question Lui's case presents is

whether a certification of extraditability pursuant to the

US-UK bilateral extradition treaty and 18 U.S.C. 3181,

3184 can issue in these circumstances. For the reasons that

follow, I believe it cannot.

On its face, Article XII of the treaty prohibits a

requesting Party from trying and punishing the relator for

crimes other than those for which he has been extradited.

Moreover, it prohibits a requesting Party from extraditing

-5- 5

the relator to a third-party sovereign. As I read Article

XII, therefore, the fairest and most reasonable inference to

be drawn from the treaty's language is that it allows only

for extradition for offenses that will be tried and punished

by the requesting sovereign.

This is not the case we have before us. Thus, in

my view, the district court correctly concluded that the most

reasonable inference from Article XII's language is that the

treaty "prohibits a person from being extradited to Hong Kong

if Hong Kong, as a Crown Colony of the United Kingdom, is

unable to try and to punish him." 1997 WL at *4. I believe

that the logical inference to be drawn from the quoted treaty

language is that Article XII requires the requesting Party to

retain exclusive jurisdiction and custody over relators

extradited to it by the requested Party. To me, the natural

meaning of the language in Articles I and XII suggests that a

"condition" to extradition under the treaty is that a relator

is to be tried and punished in the courts and prisons of the

Contracting Party requesting extradition. This requirement

is subject solely to the exceptions provided for in

subsections (1)(a) and (b), which do not apply here because

the reality in this case is that Crown Colony authorities

will neither return Lui to United States territory nor give

him 30 days' freedom to leave Hong Kong prior to surrendering

him to their Chinese successors, as those subsections would

-6- 6

alternately require. On the facts revealed, therefore, I

believe the district court correctly concluded that Lui

cannot be certified for extradition because the United

Kingdom fails to "live up to the terms of its extradition

agreement with the United States." Id. at *4. 

The purpose to be gleaned behind Article XII's

words also supports the position that Lui cannot be certified

for extradition in the current circumstances. This circuit

has indicated that "[t]he existence of such [an extradition]

treaty between the United States and another country

indicates that, at least in a general sense, the executive

and legislative branches consider the treaty partner's 

justice system sufficiently fair to justify sending accused

persons there for trial." In re Extradition of Howard, 996 

F.2d 1320, 1329 (1st Cir. 1993) (emphasis added) (citing

Glucksman v. Henkel, 221 U.S. 508, 512 (1911); Neely v. 

Henkel (No. 1), 180 U.S. 109, 123 (1901)). 

In this particular instance, I agree with the

district court that the US-UK bilateral treaties are

"premised on the trust running between the United States and

the United Kingdom." Lui, 1997 WL at *5. In my view, the 

district court rightly noted that Article XII's language

manifests an exchange of promises between our nation and a

trusted treaty partner: "[t]he United Kingdom is promising

that it, and only it, will try and will punish [relators

-7- 7

like] Lui for specified crimes, and no others. By its

adoption of the Treaty, the United States manifests its

belief in that promise of the United Kingdom." Id. Because 

the Crown Colony's extradition request in this case fails to

live up to this promise by the United Kingdom, I believe that

the district court properly concluded that a certification

for Lui's extradition to Hong Kong cannot issue. As this

court has recently explained, in extradition cases "[t]he

requesting state must 'live up to whatever promises it made

in order to obtain extradition.'" United States v. 

Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995) (quoting United 

States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.) (per 

curiam), cert. denied, 479 U.S. 1009 (1986)).5 

 

5The panel opinion relies upon Saccoccia, a case 
that involved the interpretation of an extradition treaty
between the United States and Switzerland, to argue that
federal extradition procedures do not give judicial officers
the discretion to refuse the issuance of certificates of
extraditability "on the ground that a treaty partner cannot
assure the requested country that rights under a treaty will
be enforced or protected." Slip op. at 29 (citing Saccoccia, 
58 F.3d at 766-67). My research fails to find support for
the proposition for which the panel cites Saccoccia. On my 
reading, Saccoccia indicates that Article XII's "specialty" 
provision does not require an exact mirror-image between the
precise indictment that prompts an extradition and the
subsequent prosecution. See 58 F.3d at 766-67. Because that 
is not the problem that I believe to be fatal to the
extradition request in Lui's case, and as I indicate in the
main body of my dissent, I believe that Saccoccia is properly 
read, if at all, to support an interpretation of Article XII
that would preclude the issuance of a certificate of
extraditability in the unique circumstances present here.

-8- 8

In arriving at my conclusion I am mindful of the

Supreme Court's seminal extradition decision in Terlinden v. 

Ames, 184 U.S. 270, 289 (1902). In Terlinden, the Court 

explained that a state requesting a relator's extradition

must be "competent to try and to punish him." Id. at 289. 

The Terlinden Court was asked to determine whether the German 

Empire could successfully request a relator's extradition on

the basis of a treaty between the United States and the

Kingdom of Prussia, where the two sovereigns, King and

Emperor, were one and the same. See id. at 284. The Court 

concluded that the Kingdom of Prussia, although part of the

subsequently formed German Empire, continued to enjoy "its

identity as such," and treaties that it had entered could

still be performed "either in the name of its King or that of

the Emperor." Id. at 285. In making its determination, the 

Court explained that "the question whether power remains in a

foreign State to carry out its treaty obligations is in its

nature political and not judicial, and that the courts ought

not to interfere with the conclusions of the political

department in that regard." Id. at 288.  

The situation in Terlinden, however, is different 

than the one raised by Lui's case. In Terlinden, the 

question was whether or not the Kingdom of Prussia continued

to have an independent existence and whether its treaty

obligations could be exercised in the name of its King

-9- 9

notwithstanding the fact that he had subsequently acquired

"the title of German Emperor." Id. at 284. The impending 

reversion of sovereignty over Hong Kong does not raise this

question. No one doubts -- and the government does not

dispute -- that the Crown Colony of Hong Kong will cease to

exist beyond reversion to China. If some doubt existed on

this score, Terlinden counsels that the judicial department 

would have to defer to the judgment of the political branches

because the action of the political branches of government

"must be regarded as of controlling importance" on the

question of "whether [a] treaty has ever been terminated."

184 U.S. at 285. Lui's case frames an entirely different

question. The extradition request from the Crown Colony of

Hong Kong does not raise the issue of whether or not the US-

UK extradition treaties have been terminated. Instead it

raises the question of whether the requesting sovereign is

"competent to try and to punish him." Id. at 289.  

In my view, the Supreme Court in Terlinden makes a 

distinction between a state's "power . . . to carry out its

treaty obligations" (a determination on which the judiciary

must defer to the political branches), id. at 288, and a 

state's "competen[ce] to try and to punish" a relator. Id. 

at 289. The first issue goes to the question of whether a

treaty partner -- and hence a treaty relationship -- still

exists. On this issue, Terlinden informs us that courts must 

-10- 10

defer to the determination of the political branches. See 

id. at 285, 288. The second issue goes to the question of 

whether a treaty partner is fulfilling the promises and

obligations it has undertaken with the United States. See 

id. at 289. The Court's discussion in the paragraphs 

following its reference to sovereign competency makes clear

that courts retain the authority and duty to ascertain that

the treaty-established prerequisites to extraditability have

been met in a particular case. The Court noted that no

question existed in the case before it that the treaty-

created preconditions for extradition had been met. As the

Court explained, 

If it be assumed in the case before us, and 
the papers presented on the motion for a stay 
advise us that such is the fact, that the 
commissioner, on hearing, deemed the evidence
sufficient to sustain the charges, and
certified his findings and the testimony to
the Secretary of State, and a warrant for the
surrender of Terlinden on the proper 
requisition was duly issued, it cannot be 
successfully contended that the courts could 
properly intervene on the ground that the
treaty under which both governments had 
proceeded, had terminated by reason of the 
adoption of the constitution of the German
Empire, notwithstanding the judgment of both
governments to the contrary. 

Id. at 289-90 (emphasis added). 

Therefore, contrary to the panel opinion's

suggestion, the district court correctly concluded that Terlinden 

teaches that this court has jurisdiction to examine whether the

Hong Kong extradition request fulfills the obligations undertaken

-11- 11

by the United Kingdom under the treaty. See Lui, 1997 WL at *4. 

Unlike Terlinden, the relator in this case does not argue that 

the extradition treaty under which he has been sought has been

terminated because the requesting sovereign no longer exists.

Instead Lui argues and the record reveals that the Crown Colony

of Hong Kong, though it currently exists, will not try or punish

him before reversion and thus does not meet the conditions

imposed by Articles I and XII of the treaty and the Terlinden 

requirement that an authority requesting a relator's extradition

must be "competent to try and to punish him." 184 U.S. at 289. 

As I read it, Article XII indicates that the United

States and the United Kingdom undertook an agreement to extradite

relators but only for trial and punishment in the courts and

prisons of each other. Because it is conceded that the

extradition request in this case will result in Lui's being tried

and punished under the courts of another sovereign, my reading of

Articles I and XII of the treaty convince me that the British

Hong Kongese authorities fail to live up to the obligations

undertaken by the United Kingdom. If Lui may be extradited at

all pursuant to the bilateral US-UK extradition treaties, I read

the relevant treaty provisions to say that this may occur only if

the United Kingdom or authorities accountable to it retain

exclusive jurisdiction over Lui's person following Hong Kong's

reversion to China. Because the Crown Colony will surrender

custody over Lui and jurisdiction over his criminal case to the

-12- 12

Chinese successor regime, I am of the opinion that the

extradition request in this peculiar set of circumstances

constitutes a violation of the relevant treaty terms. As such, I

believe that no certification of extraditability can issue from

this court pursuant to the US-UK extradition treaty and 18 U.S.C.

3181, 3184.

II. The Re-extradition Prohibition II. The Re-extradition Prohibition

Lui's case also presents a difficult question with

respect to whether the United Kingdom's surrender of sovereignty

over Hong Kong to China in July 1997 would effect an

impermissible re-extradition with respect to Lui under the terms

of Article XII. For the reasons that follow, I believe it would.

Article XII in relevant part provides that "[a]

person extradited [to a requesting Party] shall not . . . be

extradited by that Party to a third State." Here, upon

reversion, the United Kingdom will surrender sovereignty and

responsibility for the administration of justice in Hong Kong to

China. In the event that Lui is extradited to Hong Kong prior to

reversion, the record shows beyond question that he will be

surrendered to the courts and judicial system of a third-party

sovereign state for prosecution. The difficulty lies in

determining whether reversion and Lui's surrender to the Chinese

regime that will succeed the Crown Colony amounts to another

extradition.

-13- 13

The plain meaning and derivations of the words

"extradite" and "extradition" help lead me to conclude that the

surrender contemplated for Lui would constitute another

extradition. The dictionary definition of "extradite" is, "To

deliver up, as to another state or nation." Funk & Wagnalls New 

Comprehensive International Dictionary of the English Language 

450 (1978). "Extradition" is alternatively defined in

dictionaries as, "The surrender of an accused person by a

government to the justice of another government, or of a prisoner

by one authority to another," id., as "the surrender of an 

alleged fugitive from justice or criminal by one state, nation,

or authority to another," The Random House Dictionary of the 

English Language 685 (2d ed. 1987), and as, "The surrender or 

delivery of an alleged criminal usu[ually] under the provisions

of a treaty or statute by one country, state, or other power to

another having jurisdiction to try the charge." Webster's Third 

International Dictionary 806 (1986).6 

Legal usage has followed the word's plain meaning.

Black's Law Dictionary defines "extradition" by closely

paraphrasing the formula given in Terlinden, wherein the Supreme 

 

6The derivation of the English word is from the
French, Old French and ultimately Latin equivalents.
Specifically, the English "extradition" stems from a Latin
union of the prefix ex- [out] and traditio [a delivery or 
surrender], the latter word flowing from traditus, the past 
participle of tradere [to deliver], which, in turn, stems 
from the conjunction of trans- [across] and dare [give]. See 
Funk & Wagnalls New Comprehensive International Dictionary of 
the English Language 450, 1330 (1978). 

-14- 14

Court defined "[e]xtradition" as "the surrender by one nation to 

another of an individual accused or convicted of an offence 

outside its own territory, and within the territorial

jurisdiction of the other, which, being competent to try and to

punish him, demands the surrender." 184 U.S. at 289 (emphasis

added); Black's Law Dictionary 526 (5th ed. 1979) (replacing the 

word "nation" with "state or country").

International practice is consistent with this legal

usage of the term. Prohibitions on re-extradition, like that

found in Article XII, are fundamental features of "many

[extradition] treaties" that are generally interpreted to give

force to the broad principle of international law that "a person

extradited to one state may not be extradited or otherwise 

surrendered to a third state for prosecution." Restatement 

(Third) of Foreign Relations Law 477 cmt. d.

The operative plain meaning of the word, its legal

usage, international practice, and its etymological derivation

all indicate that the surrender which the record shows and the

government concedes is contemplated for Lui would constitute

another extradition. Upon reversion, the United Kingdom will

surrender sovereignty to China as well as surrender jurisdiction

over and custody of criminal defendants like Lui. Using the

Terlinden definition, on the peculiar circumstances in this case, 

upon reversion: (1) Lui will be "surrender[ed] by one nation to

another"; (2) he will be "an individual accused . . . of an

-15- 15

offence outside [the extraditing authority's] own territory,"

because authority over that territory will pass from the United

Kingdom to China; (3) the offenses for which Lui is accused "will

be within the territorial jurisdiction" of the receiving

authority, viz., China; and (4) the receiving authority, under 

Sino-British international agreements, specifically the Joint

Declaration regarding reversion, will be "competent to try and to

punish him." 184 U.S. at 289.

Having canvassed the relevant sources that help to

illuminate the meaning of the word "extradition," I believe that

the revealed reality that the Crown Colony will surrender custody

over Lui and jurisdiction over his criminal case to the Chinese

successor regime contemplates another extradition in violation of

Article XII of the US-UK bilateral extradition treaty. A

decision of the Ninth Circuit, on which the panel opinion in the

instant case relies, reaches a contrary result. See Oen Yin-Choy 

v. Robinson, 858 F.2d 1400, 1403-04 (9th Cir. 1988). Starting 

from the premise that this case is not controlling in this court,

this circuit should decline to follow this decision because I

believe that its argument is neither thorough nor persuasive.

Moreover, the Ninth Circuit was faced by a fact pattern quite

unlike the heightened and unique circumstances present in Lui's

case and thus was not required to squarely face the issue

presented here.

-16- 16

In Oen, the United States Attorney, acting on behalf 

of the United Kingdom and the Crown Colony of Hong Kong,

initiated extradition proceedings against Oen in April 1987, a

full decade before the scheduled date of reversion. Id. at 1403. 

Oen was charged with false accounting and publishing a false

statement, extraditable offenses under Article III of the US-UK

extradition treaty. Id. at 1405. Oen argued that if he was 

extradited and convicted then the possibility existed that he

would remain incarcerated beyond July 1, 1997, the date of

reversion. He argued that this hypothetical scenario would have

the effect of extraditing him to China in violation of Article

XII of the treaty. Id. at 1403. 

The Ninth Circuit disagreed and concluded that the

Terlinden definition of "extradition" meant that "[n]either 

deportation nor surrender other than in response to a demand

pursuant to Treaty constitutes extradition." Id. at 1404. 

Having thus rephrased the Terlinden definition, the Ninth Circuit 

panel concluded that "even if Oen becomes subject to Chinese 

authority pursuant to a reversion of sovereignty upon cession and

termination of the British lease of Hong Kong, he will not have

been extradited to China." Id. (emphasis added). 

I find the Oen court's conclusion unsatisfactory for 

three reasons. First, as my previous discussion elaborates, it

does not follow from either the commonly settled meaning of the

word "extradition" or the term's operative legal usage, as

-17- 17

manifested by the Supreme Court's definition in Terlinden. 

Instead it proceeds upon a rearticulated and truncated sense of

the term that does not correspond to Terlinden and that cuts 

against international practice and the meaning that the term and

its French and Latin cognates have carried since Roman antiquity.

Second, even on its own terms, the Oen court 

misapplied the meaning of the word "extradition." Specifically,

even if one accepts the Oen view that a surrender must be 

effectuated in response to a demand pursuant to treaty in order

for it to constitute an extradition, then a Hong Kong relator's

post-reversion surrender would qualify. In view of the treaty

architecture that surrounds the impending reversion and the

provisions in the Joint Declaration that address the juridical

and legal transfer of sovereignty, it is difficult to see how the

Crown Colony will surrender custody over Lui and jurisdiction

over his criminal case to the Chinese successor regime in the

absence of the demands on his person qua criminal defendant that 

owe their legal status solely to treaty. See, e.g., Sino-British 

Joint Declaration, para. 1 ("The Government of the People's

Republic of China declares . . . that it has decided to resume

the exercise of sovereignty over Hong Kong with effect from 1

July 1997.").7

 

7The surrender of sovereignty and Chinese demands
on Hong Kongese criminal defendants upon reversion all flow
from treaty provisions. The United Kingdom's sovereignty
over Hong Kong stems from cessions of territory made in 1842
(pursuant to the Treaty of Nanking) and 1860 (pursuant to the

-18- 18

Third, the factual pattern in Oen was radically 

dissimilar to the one that the court faces in this case. In Oen, 

the relator raised only a distant hypothetical possibility that

he would remain incarcerated in Hong Kong prisons following

reversion some ten or nine years later. No one doubted that Oen,

upon extradition, would be tried and, if necessary, sentenced by

courts of the British Crown Colony and imprisoned in Crown Colony

gaols. 

The Oen court thus did not address itself to the 

situation in this case, where it is certain as a practical matter

and conceded by the government that the relator's trial would not

be under the courts of the British Crown Colony. Therefore, the

Oen decision did not fully address the issue that squarely 

confronts us today, whether Lui's surrender to Chinese

authorities after reversion for trial will amount to another 

 

Convention of Peking) and a ninety-nine year lease contained
in the Convention of Beijing, June 9, 1898. See Shawn B. 
Jensen, International Agreements Between the United States 
and Hong Kong Under the United States-Hong Kong Policy Act, 7 
Temp. Int'l & Comp. L.J. 167, 168-69 (1993); see also 1 
Treaties and Agreements with and Concerning China, 1894-1919, 
130, No. 1898/11 (1921) (cited in Oen, 858 F.2d at 1403). 
Moreover, the three constitutive parts of Hong Kong -- Hong
Kong proper (1842), Kowloon (1860), and the New Territories
(1898) -- are scheduled to revert to China on July 1, 1997
pursuant to the Sino-British Joint Declaration which was
signed on December 19, 1984 and entered into force on May 27,
1985. See Jensen, supra, at 170-73. That international 
agreement, by addressing the Chinese successor regime's
executive, legislative, and judicial powers, provides for the
transfer of jurisdiction over persons accused of criminal
offenses and in custody in Hong Kong at the date of
reversion. See Joint Declaration, para. 3(3).  

-19- 19

extradition. Read closely, Oen simply refuses to conclude that a 

previously convicted, already incarcerated prisoner is extradited

upon reversion. This is not the predicament with Lui. I thus

believe that Oen is unpersuasive and not on point. 

III.  III. 

Legislative Intent, Judicial Deference, and Separation of Powers  Legislative Intent, Judicial Deference, and Separation of Powers 

Lui's case also presents a difficult question with

respect to whether certification of extradition in the

circumstances known to the court and conceded by the government

would comport with the legislature's intent in ratifying the US-

UK extradition treaties. For the reasons the follow, I do not

believe certifying Lui for extradition would accord with

legislative intent.

The legislative history surrounding the United States

Senate's ratification of the supplementary treaty, which the

district court ably canvassed, indicates that the Senate was

concerned about the extent and degree to which it could trust the

United Kingdom and its judicial system to be fair and just,

ultimately concluding that the United Kingdom's courts were

worthy of confidence. See 99th Cong., 2d Sess., 132 Cong. Rec. 

9119-71 (daily ed. July 16, 1986) (reprinting the Senate floor

debate on ratification) (cited in Lui, 1997 WL at *6). In my 

view, to interpret the bilateral treaties between the United

Kingdom and the United States so as to allow the benefits of such

specially placed trust to be assumed by a non-signatory sovereign

-20- 20

would fail to adhere to the Senate's intent. As the district

court explained, "[i]t is clear beyond rational dispute that the

Senate would not have ratified had there been any suggestion that

the Treaty provisions could be extended, even by circumstance, to

China." Lui, 1997 WL at *6.  

I reach this conclusion understanding full well that

the United States signed an agreement on December 20, 1996 with

the government of the fledgling Hong Kong Special Administrative

Region ("HKSAR"), the British Crown Colony's successor, which

provides for reciprocal post-reversion extradition. See 

Agreement Between the Government of the United States of America

and the Government of Hong Kong for the Surrender of Fugitive

Offenders, Dec. 20, 1996. However, the new treaty constitutes a

different bargain than the one voted upon by the Senate when it

ratified the US-UK bilateral treaties. Moreover, the new

agreement will not enter into force, if it indeed does so, until

such time as the Senate, to which the new treaty was submitted on

March 3, 1997, gives its advice and consent by a constitutionally

required two-thirds vote. See U.S. Const. art. II, 2; 143 

Cong. Rec. S1846 (daily ed. Mar. 3, 1997).8

 

8In reaching this conclusion, I am mindful of the
United States-Hong Kong Policy Act of 1992 (commonly known as
the McConnell Act), codified at 22 U.S.C. 5701-5732. As
commentators have explained, this congressional enactment
"allows the United States to treat Hong Kong, where
appropriate, as a separate entity from the PRC for purposes
of U.S. domestic law." Christopher K. Costa, Comment, One 
Country-Two Foreign Policies: United States Relations With 
Hong Kong After July 1, 1997, 38 Vill. L. Rev. 825, 855 

-21- 21

In my view, therefore, the recently signed US-HKSAR

extradition treaty is itself highly probative of the proper

interpretation that must be given to the existing bilateral

extradition treaties between the United States and the United

Kingdom under which Lui's extradition to Hong Kong is being

sought. Put simply, these treaties do not survive the surrender

of sovereignty to China and do not contemplate the surrender of

relators to stand trial in courts under the sovereign aegis of

China. See Janice M. Brabyn, Extradition and the Hong Kong 

Special Administrative Region, 20 Case W. Res. J. Int'l L. 169, 

173 (1988) ("Hong Kong's extradition relationships with other

states ha[ve] always been exclusively vested in the British

Crown. . . . Hong Kong's present extradition powers and relations

are [thus] a direct consequence of, and are dependent upon, its

colonial status. If nothing is done between now and 1997, both

powers and relations will end when that colonial status ends.").

In ratifying the US-UK bilateral extradition

treaties, I believe the political branches have judged the

 

(1993). Under the McConnell Act's provisions, "the areas in
which separate treatment is appropriate are determined by the
terms of the [Sino-British] Joint Declaration . . . . [which]
grants Hong Kong a 'high degree of autonomy' in nine areas:
economic policy, trade, finance, monetary policy, shipping,
communications, tourism, culture and sport." Id. The 
McConnell Act would not appear to have any direct bearing on
this case, which involves foreign affairs and international
law enforcement, because "[t]he Act does not establish a U.S.
policy toward Hong Kong in the two areas reserved to PRC
control by the Joint Declaration--defense and foreign
affairs." Id. at 856; see also Jensen, supra note 7, at 180- 
81.

-22- 22

justice system of the United Kingdom and of the British Crown

Colony of Hong Kong to be sufficiently fair to send accused

persons there for trial. Until such time as the Senate ratifies

the US-HKSAR extradition treaty no such similar expression of

faith or trust has been made by the political branches with

respect to China or to the Chinese successor to the British Crown

Colony, which, if he is extradited, will try and punish Lui. The

United States currently has no extradition treaty with China,

which enjoys extradition relations with but one other country,

Russia. Separation of powers principles and judicial self-

restraint counsel that this court is not at liberty to interpret

Article XII of the US-UK extradition treaty in such a way so as

to yield a result for which the Senate did not bargain in

ratifying the US-UK extradition treaty and which it is currently

debating in the form of the recently submitted US-HKSAR

agreement. See 143 Cong. Rec. S1846 (daily ed. Mar. 3, 1997).  

Of special import is the fact that the supplemental

US-UK treaty was ratified by the Senate in 1986 at a time when it

was fully aware of the widely publicized Sino-British Declaration

regarding Hong Kong's reversion in 1997. The supplemental treaty

nonetheless does not limit or otherwise circumscribe the terms of

Article XII of the main treaty. As the panel's opinion explains,

the supplemental treaty, as ratified by the Senate in 1986, "is

entirely silent on the question of reversion." Slip op. at 11.

Because Article XII, on my reading, allows only for extradition

-23- 23

for offenses that can be tried and punished by the requesting

sovereign, and because the supplemental treaty does not create

any exception for reversion-affected relators like Lui, the

treaty, as I read it and as the district court found, indicates

that no right to demand extradition and no corresponding duty to

surrender Lui exists where it is conceded that Lui will not be

tried under courts of the United Kingdom or its dependent

territories. 

This silence in the face of Article XII's apparent

requirement that relators are only to be tried by the judicial

authorities of the two Contracting Parties is telling because the

presumption in American and international law is against

extraditability in the absence of any treaty-created right or

obligation. Applicable Supreme Court precedent and "[t]he

principles of international law recognize no right to extradition

apart from treaty. While a government may, if agreeable to its

own constitution and laws, voluntarily exercise the power to 

surrender a fugitive from justice to the country from which he

has fled . . . the legal right to demand his extradition and the 

correlative duty to surrender him to the demanding country exist 

only when created by treaty." Factor v. Laubenheimer, 290 U.S. 

276, 287 (1933) (emphasis added); see also 18 U.S.C. 3181, 

-24- 24

3184; Restatement (Third) of Foreign Relations Law 475 & cmt.

a.9 

Despite the foregoing, the panel opinion construes

the US-UK treaties as requiring Lui's extradition to Hong Kong by

invoking, inter alia, the principles that extradition treaties 

are to be construed liberally in favor of enforcement, see slip 

op. at 15 (citing Laubenheimer, 290 U.S. at 298), and with great 

deference to executive branch interpretation. See id. at 14-15 

(citing Laubenheimer, 290 U.S. at 295; Howard, 996 F.2d at 1330- 

31 & n.6).

 

9The United States recognizes only one statutory
exception to this principle. Specifically, 18 U.S.C. 
3181(b) permits "the surrender of persons, other than
citizens, nationals, or permanent residents of the United
States, who have committed crimes of violence against
nationals of the United States in foreign countries without
regard to the existence of any treaty of extradition" upon
the fulfillment of certain criteria. The instant case
involves allegations of economic crimes and thus does not
implicate this recently and narrowly drawn exception to the
generally operative principle of American and public
international law. 
As the quotation from Laubenheimer indicates, it 
should be understood that this opinion draws a distinction
between voluntary extradition and extraditability as of right
or obligation. "[I]t is now clear that apart from a treaty a
state has no duty to deliver up a person who has sought
asylum within its boundaries. If the state wishes, it can
afford him a refuge and protection . . . . Of course, a state
is under no duty to afford asylum to a fugitive; it may expel
him from its territories if it choose, and without complaint
from the individual who is expelled." United States ex rel. 
Donnelly v. Mulligan, 74 F.2d 220, 222 (2d Cir. 1934). This 
distinction may appear academic in light of the government's
expressed desire to extradite Lui in this case, but it is a
distinction that is not without significance.

-25- 25

These arguments, while worthy of consideration,

ultimately fail to justify a result that does not correspond to

the relevant treaty provisions in Articles I and XII or to the

congressional intent reflected therein, viz., that the United 

States agrees to extradite fugitives sought by authorities in the

United Kingdom and its dependent territories to be prosecuted in

the courts and under the law of those jurisdictions. I agree

with the district court that a refusal to certify Lui for

extradition requires no untoward judicial interference with

prerogatives constitutionally entrusted in the executive branch

of government. On the contrary, separation of powers principles

and the prevention of undue encroachment upon the Senate's

constitutional prerogatives counsel against certifying Lui for

extradition under the peculiar circumstances present in his case.

Specifically, I do not agree that refusing

certification in Lui's case along the lines that the district

court established implies any judicial arrogation of the

executive's power over our affairs with foreign nations. Under

the analysis ably laid out by the district court, the refusal to

certify Lui's extraditability does not stem from any assessment

or judgment about the fairness or trustworthiness of the Chinese

judicial or penal systems, a determination that the third branch

of government is not generally empowered or as qualified as the

political branches to make. The district court correctly

-26- 26

concluded that the certification question is an entirely legal

one and that 

it would not matter if China's legal system
were more efficient and humane than either
the United States' or the United Kingdom's.
The bottom line is that the terms of the
Treaty do not allow extradition when the
requesting sovereign is unable to try and to
punish the relator. [And t]he Crown Colony
of Hong Kong will be unable to try and to
punish Lui prior to reversion. 

Lui, 1997 WL at *6. 

I therefore cannot agree with an interpretation of

the US-UK bilateral treaties that would permit circumstances to

conspire so as to allow a relator to be extradited to Hong Kong

where the practical reality is that China, a sovereign state with

which the United States has no extradition treaty, will try and

punish Lui. Neither can I agree with the panel opinion's

conclusion that, because Lui's extradition is sought by the

current Hong Kong regime, the right to demand extradition and the

correlative duty to surrender him in fact do exist, regardless of

what is conceded will transpire upon his arrival in Hong Kong. 

The opinion correctly notes that "governments of our

treaty partners often change, sometimes by ballot, sometimes by

revolution or other means, and the possibility or even certainty

of such change does not itself excuse compliance with the terms

of the agreement embodied in the treaties between the countries."

Slip op. at 3. But the instant case does not raise the question

presented by a mere change in government, whether peacefully or

-27- 27

violently accomplished. Instead it represents a situation in

which sovereignty over a particular territory, Hong Kong, will 

revert from one sovereign, the United Kingdom, with whom the

United States has signed and ratified an extradition treaty, to

another sovereign, the People's Republic of China, with which the

United States currently has no such treaty relationship.

In my view, this court cannot fail to differentiate

between a change in government, which ordinarily does not affect

treaty-based obligations, and a change in sovereignty brought

about when territory of one sovereign state is ceded and becomes

part of the territory of another preexisting state, which

generally terminates the effect of treaties of the predecessor

state with respect to the territory in question. See Vienna 

Convention on Succession of States in Respect of Treaties, art.

15, U.N. Doc. A/CONF. 80/31 (1978), 72 Am. J. Int'l L. 971

(1978).10 

 

10Although the Convention on Succession presently
lacks the requisite signatories for it to enter into force, and
although the United States is not a signatory, the Convention is
nonetheless viewed as an authoritative statement of the rule
governing the succession of states under public international
law. See Jensen, supra note 7, at 180-81 (citing Michael 
Akehurst, A Modern Introduction to International Law 159 (1987) 
(noting that while the Convention on Succession "is not yet in
force . . . many of its provisions codify the customary
international law on the subject")).

-28- 28

Whatever difficulties may arise in sorting out

succession questions in other contexts,11 in this case it is

clear -- and the executive branch does not question -- that Hong

Kong will not succeed to the rights and obligations contained in

the US-UK extradition treaties, as might have been the case had

Hong Kong become an independent state in its own right rather

than reverting to Chinese sovereignty. See, e.g., Brabyn, supra 

at 174 ("For treaty-based relations, ex-colonies can often rely

upon the general principles of treaty succession [to secure

continuity in international legal relations]. . . . Hong Kong

[however] is not moving from colonial status to independence. It

is being restored to the sovereignty, or resuming its place as

part, of the PRC. . . . [After reversion, existing international

treaties involving Hong Kong] must be read as subject to

incompatibility with the sovereignty of the PRC.").

Accordingly, I believe that this court must recognize

that the Crown Colony's present ability to fulfill the

requirements imposed by the US-UK extradition treaties can only

be assessed in light of the concession that the Crown Colony will

not in fact try or punish him and with an eye to the fact that

the Chinese successor regime in Hong Kong will not succeed to the

Crown Colony's extradition rights and obligations. See id. 

 

11See generally D.P. O'Connell, State Succession in 
Municipal Law and International Law (2 vols. 1967); D.P. 
O'Connell, The Law of State Succession (1956); Louis Henkin et 
al., International Law 286 (3d ed. 1993); Restatement (Third) of 
Foreign Relations Law 208, Reporters' Note 1.

-29- 29

Because of these facts, this court cannot certify Lui for

extradition because the Crown Colony's extradition request fails

to live up to the United Kingdom's promise, as I believe

memorialized in the terms of the extradition treaties, to try all

relators extradited from the United States in courts under its

jurisdiction.

Finally, I am unpersuaded by the panel's argument

that refusing to certify Lui for extradition would be improper

because it might mean that "any relator extradited from the

United States to Hong Kong at any point since the signing of the

Joint Declaration, was, if he faced a term of imprisonment upon

conviction that could conceivably extend past the date of

reversion, sent to Hong Kong in violation of the Treaty." Slip

op. at 30.

In the first place, as I explained earlier in

discussing Oen, Lui's case raises a peculiar set of 

circumstances. The record indicates and the government concedes

that Lui will be both tried and, if convicted, punished under a

judicial and penal system not under the jurisdiction of the

United Kingdom. Second, I am not persuaded by the panel's

argument that refusing to certify Lui might cast aspersions on

the rectitude of other near-reversion extraditions and thus "make

extradition to Hong Kong . . . the exception rather than the

rule." Slip op. at 29 (quoting Oen, 858 F.2d at 1404). The 

implication would appear to be that this cannot be what the

-30- 30

Senate intended. In view of the legislative considerations and

determinations that I have outlined above, I do not believe that

this court can speculate that the unavailability of extradition

to Hong Kong in the circumstances of this case fails to uphold

the Senate's expressed concerns and legislated intent. The US-UK

extradition treaties do not just implicate Hong Kong; they are

comprehensive agreements that encompass the United Kingdom and

all the territories dependent upon it.12 I cannot agree with the

panel's implication that the district court's interpretation

would have been a deal-breaker and the Senate would have refused

to ratify the treaties if it had been told that their terms would

be interpreted to prevent Lui's extradition in these

circumstances. On the contrary, I believe that the district

court was much nearer the mark when it concluded that "[i]t is

clear beyond rational dispute that the Senate would not have

ratified had there been any suggestion that the Treat[ies']

provisions could be extended, even by circumstance, to China."

Lui, 1997 WL at *6. 

To conclude, this court faces a situation that my

research indicates has no truly analogous counterpart in the

annals of modern international law. Because I do not believe

that the panel's opinion reaches the correct result, and because

I believe that the full court should hear and consider the

 

12See supra note 2. 

-31- 31

numerous difficult legal questions that this case raises, I would

grant the petition for en banc review.

For the foregoing reasons, I respectfully dissent

from the denial of the petition.

-32- 32