DeMOSS, Circuit Judge,
dissenting.
Our Constitution is the result of a deliberate plan for the separation of powers, designed to prevent both the arrogation of authority and the potential for tyranny. Notwithstanding our nation’s moral duty to assist the cause of international justice, our nation’s actions taken in that regard must comport with the Constitution’s procedures and with respect for its allocation of powers. That is why we claim to be a nation ruled by law rather than men.
The Attorney General’s litigation position in this case has apparently been chosen for the purpose of validating a constitutional shortcut which would bypass the Treaty Clause. She stakes her case on the validity and enforceability of a warrant issued by the United Nations International Criminal Tribunal for Rwanda, which is a nonsovereign entity created by the United Nations Security Council, purporting to “DIRECT” the officials of our sovereign nation to surrender the accused. In defense of this, the Attorney General relies exclusively on what my colleagues have termed a “Congressional-Executive Agreement” — the coincidence of an “executive agreement” with the Tribunal, entered on behalf of the United States by an ambassador appointed by the President in the course of his duties to conduct foreign affairs, and a purported enabling act passed by simple majorities of both houses of Congress and signed into law by the President.
A structural reading of the Constitution compels the conclusion that most international agreements must be ratified according to the Treaty Clause of Article II. The history of national and international practice indicate that extradition agreements fall into this category. Our Founding Fathers intended that the President have authority to negotiate such agreements, but also that they be ratified pursuant to a special process intended to set a higher standard of legislative agreement than that required for ordinary legislation. The Constitution thus provides a plain procedure for entering into a treaty, which requires the assent of the President and two-thirds of the Senate. That procedure was not followed with respect to the executive agreement to extradite fugitives to the International Criminal Tribunal for Rwanda, and the procedure is not satisfied by the combination of an executive agreement and ordinary legislation. For this reason, I respectfully dissent from the majority’s conclusion that the Constitution permits the extradition of Elizaphan Ntakirutima-na based upon a foreign warrant invoking an executive agreement and its implementing statute.
I.
The Attorney General seeks to surrender Elizaphan Ntakirutimana to the Inter *432 national Criminal Tribunal for Rwanda based on three legal authorities. The first of these authorities is an executive agreement, the “Agreement on Surrender of Persons” between the United States and the Tribunal (hereinafter, Surrender Agreement).[1] The Surrender Agreement was signed on behalf of the United States by the American ambassador to The Netherlands, and it purports to satisfy “the obligation of the United States, pursuant to the Statute of the Tribunal adopted by United Nations Security Council Resolution 955 ... to surrender accused or convicted persons to the Tribunal.” Surrender Agreement, 1996 WL 165484, at *1. United Nations Security Council Resolution 955 requires that “all States shall cooperate fully with the International Tribunal and its organs in accordance with the present resolution and the Statute of the International Tribunal” and “all States shall take any measures necessary under their domestic law to implement the provisions of the present resolution and the Statute, including the obligation of States to comply with requests for assistance or orders issued by a Trial Chamber under Article 28 of the Statute.”[2]
Accordingly, the Surrender Agreement provides that:
The United States agrees to surrender to the Tribunal, pursuant to the provisions of this Agreement and the Statute, persons, including United States citizens, found in its territory whom the Tribunal has charged with or found guilty of a violation or violations within the competence of the Tribunal as defined in the Statute.
Surrender Agreement, art. I, § 1, 1996 WL 165484, at *1.
The second authority is an act of Congress, the National Defense Authorization Act for Fiscal Year 1996 (the Act), Pub.L. No. 104-106, § 1342, 110 Stat. 186, 486. Section 1342 provides, in pertinent part:
[T]he provisions of chapter 209 of title 18, United States Code [18 U.S.C. § 3181 et seq.], relating to the extradition of persons to a foreign country pursuant to a treaty or convention for extradition between the United States and a foreign government, shall apply in the same manner and extent to the surrender of persons, including United States citizens, to ... (B) the International Tribunal for Rwanda, pursuant to the Agreement Between the United States and the International Tribunal for Rwanda.
Pub.L. No. 104-106, § 1342(a), 110 Stat. 186, 486 (1996), reprinted in 18 U.S.C.A. § 3181 note at 214 (West Supp.1999).
Section 1342(a) has a curious history. First, the provision obviously bears no relation by subject matter to the general theme of the Act in which it was enacted, which was matters pertaining to the national defense. Predictably, then, no language bearing any relation to this provision can be found in the original bills proposed in the House of Representatives and Senate for the 104th Congress.[3] The *433 first suggestion about a provision permitting extradition to the International Criminal Tribunals came in the form of a floor amendment offered by Senator Ar-len Specter of Pennsylvania. The Specter Amendment, No. 2081, supplied the language which was ultimately enacted as § 1342 of the Act.[4] Senator Specter indicated that this amendment contained legislation which was being sought by the President,[5] and with this assurance (and without further discussion), the leadership of the Senate accepted the amendment.[6] In conference, the House receded to the Specter Amendment “with a technical amendment.” H.R.Conf.Rep. No. 104-450 (1996), reprinted in 1996 U.S.C.C.A.N. 238, 391. Subsection (a)(1) of the Specter Amendment (ultimately Pub.L. 104-106, § 1342(a)(1), the provision at issue in this appeal) was not altered. The conference report was accepted by the Senate on a 56-34 vote and by the House of Representatives on a 287-129 vote. Public Law 104-106 was subsequently signed by President Clinton, and the Specter Amendment thereby got slipped into law through the back door, without any public discussion or debate about its substantive merits.
Although it relates to foreign relations and performs a function historically performed by treaties, the Specter Amendment (§ 1342) did not originate in the Senate Foreign Relations Committee,[7] and no hearings or deliberations of any sort were ever held by that committee on the subject of extradition to the international criminal tribunals established by the United Nations Security Council. Likewise, although § 1342 relates to extradition procedures in United States courts, it was never considered by the Senate Judiciary Committee.[8] Most curiously, the provision does not purport to be an amendment to the existing statutes on extradition and it was not codified. It appears in the United States Code Annotated only as a “statutory note” — a literal afterthought. If the ratification of an extradition agreement is a legislative function which our Founding Fathers intended to be performed under the Treaty Clause, the history of the passage of § 1342 stands in stark contrast to that heightened legislative standard. It was a *434 parasite on the defense spending authorization bill, the ultimate passage of which never could have been questioned. Like one of our B-2 stealth bombers, it slipped through the radar net of the legislative process without the public awareness, debate, and consideration normally given to legislation of this importance.
The third authority invoked by the Attorney General is a warrant issued by the United Nations International Criminal Tribunal for Rwanda, located in Arusha, Tanzania. The warrant reads, in pertinent part: “I, Judge William H. Sekule, Judge of the International Criminal Tribunal for Rwanda ... HEREBY DIRECT the Authorities of the United States of America to search for, arrest and surrender to the International Criminal Tribunal for Rwanda: Elizaphan Ntakirutimana .... [who is] currently believed to be in the United States of America.” Prosecutor v. Ntakirutimana, No. ICTR-96-17-1 (U.N.I.C.T.R. Sept. 7, 1996) (warrant of arrest and order for surrender). The Tribunal is not a sovereign nation.
II.
The “Congressional-Executive Agreement” method of ratifying the Surrender Agreement with the Tribunal runs afoul of the Constitution’s Treaty Clause, and § 1342 alone is constitutionally insufficient to ratify the Surrender Agreement which has been invoked to support the extradition.
A.
Article II, § 2 of the Constitution provides:
The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.
He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.
The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.
U.S. Const, art. II, § 2. The Congressional-Executive Agreement did not conform to this procedure. Not only was ordinary legislation passed in lieu of the Senate’s advice and consent, but also the required threshold for passage in the Senate of approval by two-thirds was not achieved.
The Constitution’s treaty procedure must be followed in order to ratify an extradition agreement which contractually binds our nation to respect obligations to another nation. The intent of the framers could not be clearer on this point. Our Founding Fathers were very concerned about the new nation becoming entangled in foreign alliances. The possibility of giving the President full authority for foreign affairs was considered and rejected. In The Federalist No. 75, Alexander Hamilton argued that it would be “utterly unsafe and improper” to completely entrust foreign affairs to a President, who is elected for only four years at a time. The Founders were especially concerned with the *435 possibility that, in the conduct of foreign policy, American officials might become seduced by their foreign counterparts or a President might actually betray the country. Thus, while primary responsibility for foreign affairs was given to the President, a significant restraint and “check” on the use of the treaty power was created by requiring for treaties the advice and consent of two-thirds of the Senate. See The Federalist No. 69 (Alexander Hamilton) (noting that this “check” is a major distinction between the presidency and England’s monarchy, in which the king was “the sole and absolute representative of the nation in all foreign transactions”). The decision to require approval of two-thirds of Senators was controversial and hotly debated, but it was ultimately decided that sheer importance of the treaty power merited such a treatment. Treaties cannot be accomplished by any means other than the Article II treaty ratification procedure.
Of course, not all agreements with foreign countries require the full Article II “treaty” treatment in order to be effective. The Constitution implicitly recognizes a hierarchy of arrangements with foreign countries, of which treaties are the most sacrosanct. Compare U.S. Const, art. I, § 10, cl. 1 (“No State shall enter into any Treaty, Alliance, or Confederation.... ”), tvith U.S. Const, art. I, § 10, cl. 3 (“No State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State, or with a foreign Power....”). The Attorney General’s primary argument in defense of the enforceability of the extradition agreement with the Tribunal follows this line of thought. She has argued, and the majority echoes (see Majority Op. at 424), that the Constitution contains no explicit reference to extradition.
But the fact of the matter is that while the Constitution has no provisions explicitly relating to extradition, it likewise has no provisions explicitly relating to executive agreements. It only mentions treaties. Our national government is one of limited, enumerated powers. See, e.g., United States v. Lopez, 514 U.S. 549, 551, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (quoting The Federalist No. 45 (James Madison)); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77, 2 L.Ed. 60 (1803). All agree that the Surrender Agreement is not a treaty. We are therefore left to read between the lines to ascertain whether the President and Congress have wrongfully attempted by ordinary legislative procedures, to exercise a power governed by the Treaty Clause or whether some source of power other than the Treaty Clause enables the President and Congress to bind the country to the Surrender Agreement.
Our inquiry is significantly informed by a demonstration of what specific powers are encompassed by the Treaty Clause. “A treaty is in its nature a contract between two nations, not a legislative act.” Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829); see also Edye v. Robertson (Head Money Cases), 112 U.S. 580, 598-99, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884). Alexander Hamilton explained:
The power of making treaties ... relates neither to the execution of the subsisting laws, nor to the enaction of new ones; and still less to an exertion of the common strength. Its objects are CONTRACTS with foreign nations, which have the force of law, but derive it from the obligations of good faith. They are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign.
The Federalist No. 75. It is precisely the position of the Attorney General that the Surrender Agreement is a valid contract with a foreign authority and that it has the force of law. In Alexander’s day, an agreement with those characteristics was called a treaty.
If the Treaty Clause is to have any meaning there is some variety of agreements which must be accomplished through the formal Article II process. Otherwise, the heightened consideration dictated by Article II could be avoided by *436 the President and a majority of Congress simply by substituting the label of “executive agreement” for that of “treaty;” The Supreme Court has recognized this principle:
Express power is given to the President, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur, and inasmuch as the power is given, in general terms, without any description of the objects intended to be embraced within its scope, it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty, if not inconsistent with the nature of our government and the relation between the States and the United States.
Holden v. Joy, 84 U.S. (17 Wall.) 211, 242-43, 21 L.Ed. 523 (1872) (emphasis supplied).
Plainly, an extradition agreement is a type of agreement historically found in a treaty and therefore governed by the Treaty Clause. Extradition, which is defined as “the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender,” Terlinden v. Ames, 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902), has usually been regarded as the proper subject of negotiation and treaty. Historically, the United States has not surrendered a person to a foreign authority (excluding countries or territories controlled by the United States) in the absence of a valid extradition treaty.[9] Every extradition agreement ever entered into by the United States (before the advent of the new Tribunals) has been accomplished by treaty, including the Jay Treaty (1795) and the Webster Ashburton Treaty (1842). The original extradition statutes, enacted in 1848, required the existence of an extradition treaty, and there was no exception until § 1342 was passed to accommodate the Tribunals for Rwanda and the former Yugoslavia. Furthermore, “the principles of international law recognize no right to extradition apart from treaty.” Factor v. Laubenheimer, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933).
The insistence on the use of the treaty power for certain types of international agreements comports with the Founding Fathers’ intention that the President not have unfettered discretion to enter agreements with foreign nations. See The Federalist No. 75 (Alexander Hamilton). Unless the Article II procedure is insisted upon, the President can exercise such plenary power simply by denominating his agreements as something other than “treaties.” See Laurence H. Tribe, Taking Text and Structure Seriously: Reflections on Freeform Method in Constitutional Interpretation, 108 Harv.L.Rev. 1221, 1273 & n. 179 (1995); cf. Freytag v. Commissioner, 501 U.S. 868, 880, 111 S.Ct. 2631, 2639, 115 L.Ed.2d 764 (1991) (“Neither Congress nor the Executive can agree to waive this structural protection [of the Appointments Clause].... The structural interests protected by the Appointments Clause are not those of any one Branch of government but of the entire Republic.”); Weiss v. United States, 510 U.S. 163, 189, 114 S.Ct. 752, 766, 127 L.Ed.2d 1 (1994) (Souter, J., concurring) (same).
Notably, the United States has publicly declared to the entire world that it can only enter into an extradition agreement through a treaty. In its fifth reservation to the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, the United States proclaimed to the international diplomatic community that it “reserves the right to effect its participation in any such tribunal *437 only by a treaty entered into specifically for that purpose with the advice and consent of the Senate.”[10] There is no treaty which has been entered into “with the advice and consent of the Senate” which authorizes the participation in the Tribunal by the United States. This reservation clearly evidences the intent and expectation of the United States that the only way its participation in the Tribunal could take place was by a duly negotiated and ratified treaty on that subject. A reading of the Treaty Clause of the Constitution which permits the semantic shenanigans suggested by the Attorney General is an insult to the intricate structure of the Constitution, which seeks to avoid tyranny and ensure democracy through a deliberate separation of power and a delicate system of checks and balances. See, e.g., Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991); The Federalist No. 28 (Alexander Hamilton); The Federalist No. 51 (James Madison). In contrast, § 1342(a) came into being without hearings by any committee of the Congress, without a committee report from any committee of Congress, and without any debate on the floor of the Senate or the House of Representatives as to the substance of its provision. I therefore am compelled to conclude that Ntakirutimana may not be constitutionally surrendered because of the failure of the executive and legislative branches to comply with Article II.[11]
B.
The Attorney General and my colleagues in the majority place great reliance on Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), in which the Court stated: “It cannot be doubted that the power to provide for extradition is a national power; it pertains to the national government and not to the states. But, albeit a national power, it is not confided to the Executive in the absence of treaty or legislative provision.” 299 U.S. at 8, 57 S.Ct. at 102 (internal citation omitted). Valentine was a case that did involve a treaty — its stray reference to “legislative provision” is pure dicta, and certainly not a plain holding that extradition may be accomplished by the President simply on the basis of congressional approval. Likewise, in Terlinden v. Ames, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902), in which the Court noted that “[i]n the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision,” 184 U.S. at 289, 22 S.Ct. at 492, there was also a valid extradition treaty, and the reference to a “legislative provision” is again dicta.
The Attorney General insists that the President has the power to unilaterally enter an extradition agreement with foreign nations, the only distinction between that variety of agreement and an Article II treaty being that only a treaty will impose upon the President a duty to extradite. In defense of this principle, the Attorney General points to Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), which states:
While a government may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he had fled, and it has been said that it is under a moral duty to do so, the legal right to demand his extradition *438 and the correlative duty to surrender him to the demanding country exist only when created by treaty.
290 U.S. at 286, 54 S.Ct. at 192 (internal citation omitted); see also United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886).
But these cases do not support the Attorney General’s position. The quoted passage stands for the unremarkable propositions that a sovereign nation can (and perhaps should), if consistent with its own laws, surrender to another sovereign nation one of the surrendering nation’s own citizens who is accused of crimes by that other sovereign nation, but that no such duty or legal obligation arises absent a treaty. Those propositions do not mean that the President, acting unilaterally, can enter non-binding executive agreements to extradite,[12] or that Congress may ratify such an agreement. The Attorney General does not purport to act pursuant to some sort of sovereign power to surrender Ntakirutimana; she has consciously premised her argument on the validity and enforceability of the Surrender Agreement. This is plain from the briefs filed in this Court.[13] Given that the Surrender Agreement is the authority invoked by the Attorney General, it is the authority which we must consider.
III.
The executive and legislative branches of government erroneously disregarded their obligation to respect the structure provided by the Constitution when they purported to enter this extradition agreement.[14] We should issue a writ of habeas corpus, and Ntakirutimana should not be surrendered. The extradition agreement in place between the United States and the Tribunal is unenforceable, as it has not been properly ratified. The agreement’s implementing legislation is unconstitutional insofar as it purports to ratify the Surrender Agreement by a means other than that prescribed by the Treaty Clause. The two acts seek impermissibly to evade the mandatory constitutional route for implementing such an agreement.[15] I therefore respectfully dissent.[16]

. See Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory Of Neighboring States, Jan. 24, 1995, U.S — ICTR, available in 1996 WL 165484.

. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 2, U.N. Doc. S/RES/955 (1994), available in ICTR — Resolutions of the Security Council (visited July 26, 1999) <http://www.un.org/ictr/english/Resolutions/ 955e.htm.>

.See S. 1026, 104th Cong. (1995); available in U.S. Gov't Printing Office, GPO Access (hereinafter, GPO Access) (visited July 27, 1999) <http://frwebgte.access.gpo.gov/cgi-bin/ getdoc.cgi?dbname=104_cong_bills&docid= f:sl 124pcs.txt.pdf>; H.R. 1520, 104th Cong. (1995), available in GPO Access (visited July *433 27, 1999) <http://frwebgate.access.gpo. gov/cgi-bin/getdoc.cgi?dbname= 104_cong_ bills&docid=f:hl530ih.txt.pdf>.

. See 142 Cong.Rec. SI 1218 (daily ed. Aug. 2, 1995), available in GPO Access (visited July 27, 1999) <http://frwebgate.access.gpo.gov/ cgi-bin/getpage.cgi?dbname=1995_record& page=S11218&position=all>.

. See 141 Cong.Rec. S10316 (daily ed., July 19, 1995), available in GPO Access (visited July 27, 1999) <http://frwebgate.access.gpo. gov/cgi-bin/getpage.cgi?position=all&page= S10316&dbname=1995_record> (noting referral to the Committee on the Judiciary of a "communication from the Assistant Attorney General, Office of Legislative Affairs, transmitting, a draft of proposed legislation to enable the United States to meet its obligations to surrender offenders and provide evidence to ... the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of Humanitarian Law Committed in the Territory of Rwanda and Citizens Responsible for Genocide and other such Violations Committed in the Territory of Neighboring States”); 141 Cong.Rec. H7010 (daily ed., July 13, 1995), available in GPO Access (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?posilion=all&page=H7009& dbname=1995_record> (same).

. See 141 Cong.Rec. SI 1422 (Aug. 4, 1995), available in GPO Access (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S11422 &dbname=1995_record>

. The jurisdiction of the Foreign Relations Committee includes, among other things, "[rjelations of the United States with foreign nations generally” and "[t]reaties and executive agreements.” Sen. Foreign Relations Committee Rule 1(a), available in GPO Access (visited July 27, 1999) <http://www.access. gpo.gov/congress/senate/srules 11 .txt>.

. The jurisdiction of the Judiciary Committee includes, among other things, "[fjederal courts and judges” and "[¡judicial proceedings, civil and criminal, generally.” U.S. Senate Judiciary Comm., Jurisdiction (visited July 27, 1998) <http://www.senate.gov/ judiciaiy/jurisdic.htm>.

. The Attorney General cites only one historical example of such an extradition, but explic-illy refrains from opining as to whether that extradition was validly accomplished.

. United States Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide (Nov. 25, 1988), available in United Nations, United Nations Treaty Collection Web Site (visited July 27, 1999) <www.un.org/Depts/Treaty/final/ts2/newfiles /part_boo/iv_boo/iv_l .html >.

. See Then v. Melendez, 92 F.3d 851, 853 (9th Cir.1996) ("The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty.”) (dicta); Gouveia v. Vokes, 800 F.Supp. 241 (E.D.Pa.1992) (extradition must be authorized by a treaty).

. See Valentine, 299 U.S. at 17, 57 S.Ct. at 106; M. Cherif Bassiouni, International Extradition: United States Law and Practice 67 (3d ed.1996).

. A recent news story made this point clear, reporting: "Federal prosecutors handling the [Ntakirutimana] case say the United States has a valid contract with the United Nations to enforce resolutions of the U.N. Security Council." U.S. Appeals Court to Hear Extradition Case of Rwandan Pastor, AP, Mar. 11, 1999, available in LEXIS, News Library, Wires File.

. It is not true, as has been suggested in the media, that "[i]f Mr. Ntakirutimana’s constitutional argument prevails, it will diminish the ability of the United States to cooperate in international war crimes prosecutions.” War Crimes and Extradition, Wash. Post, Apr. 10, 1999, at A20, available in 1999 WL 2210242. All that is required for participation is conformance with the Constitution. If the President wishes to bind the United States to an agreement such as the Surrender Agreement, he musts obtain the advice and consent of two-thirds of the Senate as provided in Article II.

. Whether executive and legislative actions such as those giving rise to this case reflect, as political commentator George Will has suggested, a disturbing trend of "dilution of American democracy," I leave for others to judge. George Will, See You in Congress ..., Wash. Post, May 20, 1999, at A29, available in 1999 WL 17003981 and Sacramento Post, Sacbee Voices — George Will (visited July 27, 1999) <http://www.sacbee.com/voices/national/will/will_l 9990520.html>.

. Ntakirutimana challenges the Tribunal itself as an ultra vires creation of the United Nations Security Council. His is not a novel argument — the authority of the ad hoc Tribunals for Rwanda and the former Yugoslavia has been hotly debated in academia, see, e.g., Tara Sapru, Comment, Into the Heart of Dark *439 ness: The Case Against the Foray of the Security Council Tribunal into the Rwandan Crisis, 32 Tex. Int’l LJ. 329, 339 (1997), rejected by Rwanda's neighbors who refuse to accept the ICTR's process, and fully litigated in the Tribunal for the former Yugoslavia. To the extent that the viability of the Tribunal is a legitimate subject of foreign policy within the realm of the Executive, separation-of-powers concerns justify our Court in abstaining from the political question of the Tribunal's authority. See Baker v. Carr, 369 U.S. 186, 210-11, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); see generally 13 Charles Alan Wright et ah, Federal Practice and Procedure § 3529 (2d ed.1984).